# United States Court of Appeals

*for the*

# Third Circuit

Case No. 26-2280

VOTER REFERENCE FOUNDATION LLC,

*Appellant,*

– v. –

ALBERT SCHMIDT, in his official capacity as
Secretary of the Commonwealth of Pennsylvania,

*Appellee.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA IN NO. 1:24-CV-00294,
HONORABLE JOSEPH F. SAPORITO, JUNIOR, DISTRICT JUDGE

## BRIEF AND JOINT APPENDIX
## Volume 1 of 3 (Pages Appx1 to Appx57)

EDWARD D. GREIM
MATTHEW R. MUELLER
SARAH R. PINEAU
KATHERINE E. MITRA
GRAVES GARRETT GREIM LLC
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: 816-256-5958
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
spineau@gravesgarrett.com
kmitra@gravesgarrett.com

*Attorneys for Plaintiff-Appellant*

COUNSEL PRESS
A Proceed Service     (800) 4-APPEAL • (394524)
The Appellate Experts®

# CORPORATE DISCLOSURE STATEMENT

Voter Reference Foundation LLC ("VRF") is a single member Ohio limited liability company. Its sole member is Restoration of America (f/k/a Restoration Action, Inc.), an Ohio nonprofit corporation. No publicly held companies hold 10% or more of VRF's stock, and no publicly held corporations which are not parties to this proceeding before this Court have a financial interest in the outcome of the proceeding.

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...........................................................................................v

INTRODUCTION ........................................................................................................1

SUBJECT MATTER AND APPELLATE JURISDICTION.....................................4

STATEMENT OF THE ISSUES.................................................................................5

RELATED CASES AND PROCEEDINGS................................................................6

STATEMENT OF THE CASE....................................................................................7

SUMMARY OF THE ARGUMENT ........................................................................13

STANDARD AND SCOPE OF REVIEW ................................................................16

ARGUMENT ............................................................................................................16

   I.   VRF Has Standing to Vindicate Its Claims....................................................16

      A. VRF Has Standing for Its Access Claims. .............................................19

         1. *Courts have found standing in similar circumstances.* ........................24

         2. *VRF is distinct from* PILF v. Sec'y of Commonw. of Pa....................26

         3. *To the extent* PILF *departed from Supreme Court precedent, it was wrongly decided.* ............................................................................29

      B. VRF Has Standing to Pursue Its Remaining Claims...............................30

   II.   The NVRA Preempts the Internet Sharing Ban. ...........................................31

A. The District Court's Contrary Holding Was Erroneous...........36

III.  VRF Should Prevail on Its Access Claims..................................40

IV.  This Court Should Reverse the First Amendment Holdings........40

A. The Internet Sharing Ban Unconstitutionally Bars Political Speech.......41

1. *Pennsylvania law bans political speech.*.............................41

2. *The law cannot survive strict scrutiny.* ..............................45

B. The Internet Sharing Ban Is Overbroad. .................................50

C. The District Court's Contrary Findings Were Erroneous. .......51

V. VRF Is Entitled to Declaratory and Injunctive Relief. ...................54

CONCLUSION .......................................................................................55

# TABLE OF AUTHORITIES

**CASES**                                                                **Pages**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*

    570 U.S. 205 (2013)..................................................................53, 54

*Arizona v. Inter Tribal Council of Arizona, Inc.,*

    570 U.S. 1 (2013)..................................................................32, 33

*Ashcroft v. Free Speech Coalition,*

    535 U.S. 234 (2002)..................................................................50

*Atlas Data Privacy Corp. v. We Inform, LLC,*

    No. 25-1555, 2025 WL 3058688 (3d Cir. Sept. 2, 2025)..............................53

*Bartnicki v. Vopper,*

    532 U.S. 514 (2001)..................................................42, 45, 52, 53

*Bowley v. City of Uniontown Police Dept.,*

    404 F.3d 783 (3d Cir. 2005) ..................................................47, 48

*Camp Hill Borough Republican Ass'n v. Borough of Camp Hill,*

    101 F.4th 266 (3d Cir. 2024) ..................................................47, 49

*Campaign Legal Ctr. v. Scott,*

    49 F.4th 931 (5th Cir. 2022)..................................................3, 7, 17

*Charles H. Wesley Educ. Found., Inc. v. Cox,*

    408 F.3d 1349 (11th Cir. 2005)..................................................33

*Citizens United v. Fed. Election Comm'n,*

558 U.S. 310 (2010)..................................................................41, 44, 45

*Connick v. Myers,*

461 U.S. 138 (1983)..................................................................................42

*Crosby v. Nat'l Foreign Trade Council,*

530 U.S. 363 (2000)..................................................................32, 36, 38, 39

*Dombrowski v. Pfister,*

380 U.S. 479 (1965)..................................................................................50

*Edmonson v. Lincoln Nat'l Life Ins. Co.,*

725 F.3d 406 (3d Cir. 2013) ....................................................................16

*FEC v. Akins,*

524 U.S. 11 (1998)..............................................................................22, 30

*Fish v. Kobach,*

840 F.3d 710 (10th Cir. 2016) ................................................................33

*Fusaro v. Cogan,*

930 F.3d 241 (4th Cir. 2019) ..................................................................43

*Greater Birmingham Ministries v. Secretary of State for Alabama,*

105 F.4th 1324 (11th Cir. 2024)..............................................31, 37, 39, 40

*Harkless v. Brunner,*

545 F.3d 445 (6th Cir. 2008)..................................................................32

*Hudson United Bank v. LiTenda Mortg. Corp.*,

142 F.3d 151 (3d Cir. 1998) ........................................................................40

*Jud. Watch, Inc. v. Lamone*,

399 F. Supp. 3d 425 (D. Md. 2019).......................................................24, 33

*Kelly v. RealPage Inc.*,

47 F.4th 202 (3d Cir. 2022) ....................................................14, 17, 18, 19

*Matter of Subpoena 2018R00776*,

947 F.3d 148 (3d Cir. 2020) ........................................................................42

*McCullen v. Coakley*,

573 U.S. 464 (2014)......................................................................................47

*Meyer v. Grant*,

486 U.S. 414 (1988)......................................................................................43

*PILF v. Sec'y Commonwealth of Pa.*,

136 F.4th 456 (3d Cir. 2025) ............................ 3, 6, 17, 18, 20, 26, 27, 28, 29

*PILF, Inc. v. Bellows*,

92 F.4th 36 (1st Cir. 2024) ................... 4, 6, 14, 21, 24, 30, 31, 33, 34, 37, 38

*PILF, Inc. v. Knapp*,

749 F. Supp. 3d 563 (D.S.C. 2024) .............................................................24

*PILF, Inc. v. Matthews*,

589 F. Supp. 3d 932 (C.D. Ill. 2022)...........................................................33

*PILF, Inc. v. Nago,*

　　174 F.4th 664 (9th Cir. 2026) ...............................................................6, 26, 30

*PILF, Inc. v. Wooten,*

　　164 F.4th 362 (4th Cir. 2026) ...............................................................24

*Proj. Vote/Voting for Am., Inc. v. Long,*

　　682 F.3d 331 (4th Cir. 2012) ........................................ 21, 24, 30, 34, 46, 47

*Project Vote v. Blackwell,*

　　455 F. Supp. 2d 694 (N.D. Ohio 2006) ...............................................33

*Public Citizen v. U.S. Dept. of Just.,*

　　491 U.S. 440 (1989) ...............................................................30

*Reed v. Town of Gilbert, Ariz.,*

　　576 U.S. 155 (2015) ...............................................................48

*Reno v. ACLU,*

　　521 U.S. 844 (1997) ...............................................................41

*Smith v. Daily Mail Pub. Co.,*

　　443 U.S. 97 (1979) ...............................................................42, 48, 52

*Snyder v. Phelps,*

　　562 U.S. 443 (2011) ...............................................................42

*Sorrell v. IMS Health, Inc.,*

　　564 U.S. 552 (2011) ...............................................................41

*Spokeo v. Robins*,

578 U.S. 330 (2016)............................................................................16

*The Fla. Star v. B.J.F.*,

491 U.S. 524 (1989)..........................................................48, 49, 52, 53

*Thomas v. Cumberland County*,

749 F.3d 217 (3d Cir. 2014) .............................................................16

*TransUnion LLC v. Ramirez*,

594 U.S. 413 (2021)......................................................................17, 19

*Trinity Lutheran Church of Columbia, Inc. v. Comer*,

582 U.S. 449 (2017)............................................................................53

*United States v. Williams*,

553 U.S. 285 (2008)............................................................................50

*Virginia v. Hicks*,

539 U.S. 113 (2003)............................................................................50

*Voter Ref. Found., LLC v. Galvin*,

No. 24-CV-12592-DJC, 2026 WL 836855 (D. Mass. Mar. 26, 2026) .............

.......................................................... 4, 6, 21, 23, 24, 33, 35

*Voter Ref. Found., LLC v. Torrez*,

160 F.4th 1068 (10th Cir. 2025)................................................................

.............................. 4, 6, 14, 22, 23, 25, 29, 30, 31, 33, 35, 37, 38

*Voter Reference Found., LLC v. Torrez,*

    727 F. Supp. 3d 1014, 1033 (D.N.M. 2024),

    *aff'd*, 160 F.4th 1068 (10th Cir. 2025) ......................................................24

**RULES**

FED. R. CIV. P. 12(h)(3)..............................................................13, 16

FED. R. CIV. P. 56(a)...........................................................................16

**REGULATIONS**

4 PA. CODE § 183.14 ..................................................................2, 5, 8, 50

4 PA. CODE § 183.13 .............................................................................8

**STATUTES**

5 U.S.C. § 552a ...................................................................................49

18 PA.C.S. § 2709 ...............................................................................49

18 U.S.C. § 2721 .................................................................................49

25 PA.C.S. § 1201(3)............................................................................8

25 PA.C.S. § 1203 ................................................................................8

25 PA.C.S. § 1222 ................................................................................8

25 PA.C.S. § 1401 ................................................................................8

25 PA.C.S. § 1403 ................................................................................8

25 PA.C.S. § 1404 ................................................................................8

25 PA.C.S. § 1501 ................................................................................8

25 Pᴀ.C.S. § 1502 ..................................................................................................8

25 Pᴀ.C.S. § 1503 ..................................................................................................8

25 Pᴀ.C.S. § 1505 ..................................................................................................8

25 Pᴀ.C.S. § 1506 ..................................................................................................8

25 Pᴀ.C.S. § 1507 ..................................................................................................8

25 Pᴀ.C.S. § 1508 ..................................................................................................8

25 Pᴀ.C.S. § 1509 ..................................................................................................8

25 Pᴀ.C.S. § 1510 ..................................................................................................8

25 Pᴀ.C.S. § 1511 ..................................................................................................8

25 Pᴀ.C.S. § 1512 ..................................................................................................8

25 Pᴀ.C.S. § 1514 ..................................................................................................8

25 Pᴀ.C.S. § 3527 ................................................................................................49

28 U.S.C. § 1291 ...................................................................................................5

28 U.S.C. § 1331 ...................................................................................................5

28 U.S.C. § 1343(a)(3)-(4) .....................................................................................5

28 U.S.C. § 2201(a) ...............................................................................................5

28 U.S.C. § 2202 ...................................................................................................5

42 U.S.C. § 1983 ...................................................................................................4

52 U.S.C. § 20501 ................................... 1, 2, 3, 4, 5, 7, 14, 18, 21, 22, 26, 33, 35, 36

52 U.S.C. § 20507(i) ................................... 1, 4, 7, 19, 21, 24, 31, 34, 37, 54

52 U.S.C. § 20510(b) ..............................................4, 7, 24, 34

52 U.S.C. § 21083(a) ..............................................8

**CONSTITUTIONS**

U.S. CONST. AMEND. I ..............................................5, 41

U.S. CONST. AMEND. XIV ..............................................5

U.S. CONST. ART. VI, cl. 2..............................................5

**OTHER AUTHORITIES**

*Inspect*, Oxford English Dictionary

(2d ed. 1989) ..............................................37

## INTRODUCTION

The Public Disclosure Provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.* requires states to maintain and publicly produce official voter lists. *Id.* § 20507(i)(1). By requiring such widespread public production, the Provision accomplishes two complementary goals: it expands voting while also maintaining the integrity of elections. Appellant Voter Reference Foundation ("VRF") exists to effectuate each of these main purposes. VRF's methods are unique. To be sure, VRF directly petitions state and local election officials to improve voter list maintenance and voter participation based on VRF's own data analysis and expertise. If this was all VRF did, it would be effective. But in VRF's view, Congress aspired to so much more. That is why, unlike any other group, VRF has built widely visited websites packed with arcana to educate voters on how election administration works, state by state. It then continually updates massive, painstakingly assembled public voter databases and explains to the public how to use them. Has VRF's unorthodox method of grassroots political speech and advocacy been effective? Absolutely. It is building a mass movement so that increasingly, it is voters themselves, and not just VRF, who petition their elected officials to police election integrity and expand voting participation.

The core of VRF's advocacy—what first attracts, and then empowers citizens who choose to politically associate with VRF—is VRF's state of the art, nationwide

1

voter database. VRF only associates with individuals who agree to use their access for lawful purposes. And then on its website VoteRef.com, it teaches voters what the data means, how it was compiled, and how to use it to ensure voter roll accuracy and voter participation. It works. And to VRF, that is no surprise. Its political view aligns with the congressional policy that inspired the NVRA: integrity in election administration and the ensuing increase in voter participation are best achieved by casting sunlight into the musty corners of list maintenance.

VRF has resolved to leave no stone unturned. As part of its nationwide campaign to post voter rolls for all 50 states, VRF obtained and posted Pennsylvania's official statewide voter list on VoteRef.com. Pennsylvania voters associated with VRF and used the website. But it is precisely that speech that may have provoked the Commonwealth. Several months later, the Secretary sent a takedown letter to VRF, demanding it remove the Pennsylvania list and claiming that publication violated the Commonwealth's Internet Sharing Ban, 4 PA. CODE § 183.14(k). VRF complied and stopped sharing Pennsylvania's list for fear of prosecution.

But VRF's efforts did not end there. Desiring updated data from the Secretary, VRF again requested Pennsylvania's official state voter roll. The Secretary refused to provide it solely because VRF planned to share the data online as part of its advocacy. As VRF explains above, it has found online sharing the most efficient and

effective way to engage in advocacy, including the public oversight envisioned by the NVRA. But in Pennsylvania, VRF and others must agree to self-censorship just to *access* records which must be made available under the NVRA. And the Commonwealth's ability to prosecute online speech criminalizes the very best way to use the data to engage in political speech, advocacy, and advance the NVRA's purposes.

On the undisputed facts, VRF has suffered not only a credible threat of prosecution, but also a speech-stifling informational injury. This injury manifests itself in five downstream consequences from the Secretary's denial that bear a nexus to Congress' purposes in the NVRA. Therefore, VRF has standing. *See* Part I. For example, VRF has suffered the loss of necessary information to engage in advocacy efforts at the core of its mission, to lobby for political change, and to protect the voting rights of Pennsylvanians—all of which are sufficient consequences to demonstrate informational injuries-in-fact. *PILF v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 469 (3d Cir. 2025); *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J., concurring). On the merits, the Internet Sharing Ban, which bars VRF and others from online speech that shares this data, is preempted by the NVRA because it stands as an obstacle to its purposes. *See* Part II. As courts across the country have repeatedly held, and the district court agreed, the NVRA gives the public the right to inspect all records related to a state's voter list maintenance,

including a state's official statewide voter list. 52 U.S.C. § 20507(i)(1). Court after court has agreed that similar state bans limiting the dissemination of NVRA records are preempted. *See, e.g., Voter Ref. Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025); *PILF, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024); *Voter Ref. Found., LLC v. Galvin*, No. 24-CV-12592-DJC, 2026 WL 836855 (D. Mass. Mar. 26, 2026). The Secretary's denial of VRF's requests under the guise of the Ban independently violates the NVRA's Public Disclosure Provision, 52 U.S.C. § 20507(i)(1). *See* Part III. The Internet Sharing Ban also violates the First Amendment because it: (1) completely bans VRF's main form of speech on elections and politics; (2) is an unconstitutional condition on granting a government benefit—NVRA mandated access to the data—by forcing VRF to surrender speech rights as a condition of access; (3) cannot satisfy strict scrutiny; and (4) is overbroad. *See* Part IV. VRF is entitled to declaratory and injunctive relief to protect its federal statutory and constitutional rights to access and share Pennsylvania voter data and ensure Pennsylvania fulfills its list maintenance duties. *See* Part V. VRF respectfully asks this Court to reverse.

## SUBJECT MATTER AND APPELLATE JURISDICTION

VRF brought this action pursuant to 52 U.S.C. § 20510(b) and 42 U.S.C. § 1983 for violations of federal statutory and constitutional civil rights, including the National Voter Registration Act of 1993 (52 U.S.C. § 20501 *et seq.*), the First

Amendment (U.S. CONST. AMEND. I), the Fourteenth Amendment (U.S. CONST. AMEND. XIV), and the Supremacy Clause (U.S. CONST. ART. VI, cl. 2). VRF also sought declaratory relief and permanent injunctive relief under 28 U.S.C. §§ 2201(a), 2202. The district court therefore had subject matter jurisdiction under 28 U.S.C. §§ 1331, 1343(a)(3)-(4). This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291. VRF timely filed its notice of appeal on May 22, 2026. This appeal is from a final order and judgment, entered on April 23, 2026, which disposed of all parties' claims.

## STATEMENT OF THE ISSUES

1. Did the district court err in holding that VRF lacked standing and then refusing to reach the merits for VRF's access claims based on its informational injury when VRF alleged sufficient downstream consequences from Appellee the Secretary of the Commonwealth's ("the Secretary") actions, which bear a nexus to concrete interests Congress intended to protect under the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20501 *et seq.*? **Appx12-27** (decided); **Appx182, Appx191-193, Appx692-699** (raised); **Appx666-668, Appx682-684** (objected).

2. Did the district court err in holding that even though the Pennsylvania voter list is a "record" which must be made available under the NVRA, Pennsylvania's Internet Sharing Ban, 4 PA. CODE § 183.14(k), is not

5

preempted by the NVRA? **Appx30-45** (decided); **Appx182-190** (raised); **Appx655-656** (objected).

3. Did the district court err in holding that the First Amendment does not apply to VRF's claims, even though (1) the district court said the voter data list is a record to which VRF has a right of access, and (2) VRF already had voter data in its possession which it was forced to remove from its website due to threat of prosecution? **Appx45-50** (decided); **Appx194-207** (raised); **Appx668-677** (objected).

4. Did the district court err in holding that VRF was not entitled to declaratory and injunctive relief? **Appx50-52** (decided); **Appx180, Appx207-211** (raised); **Appx677-678** (objected).

## <u>RELATED CASES AND PROCEEDINGS</u>

This case or proceeding has not been before this Court previously. Related cases include:

- *Voter Ref. Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025)

- *Voter Ref. Found., LLC v. Galvin*, No. 24-CV-12592-DJC, 2026 WL 836855 (D. Mass. Mar. 26, 2026)

- *PILF, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024)

- *PILF, Inc. v. Nago*, 174 F.4th 664 (9th Cir. 2026), *pet. for cert. filed.*

- *PILF v. Sec'y Commonwealth of Pa.*, 136 F.4th 456 (3d Cir. 2025)

- *Campaign Legal Ctr. v. Scott*, 49 F.4th 931 (5th Cir. 2022)

## STATEMENT OF THE CASE

Congress enacted the National Voter Registration Act ("NVRA") "to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," "enhance[] the participation of eligible citizens as voters in elections for Federal office," "protect the integrity of the electoral process," and "ensure that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b). The NVRA imposes various requirements on states to effectuate these purposes. For example, the Public Disclosure Provision requires "[e]ach State to maintain for at least 2 years and make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official voter lists of eligible voters." *Id.* § 20507(i)(1). Such records "include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made." *Id.* § 20507(i)(2). The NVRA also provides for a private right of action for any person "aggrieved" by an NVRA violation. *Id.* § 20510(b).

Congress also enacted the Help America Vote Act ("HAVA") to further the goals of the NVRA. HAVA requires that each state "shall implement, in a uniform

7

and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level." *Id.* § 21083(a)(1)(A). The list must "serve as the single system for storing and managing the official list of registered voters throughout the State" and must "contain the name and registration information of every legally registered voter in the State." *Id.* § 21083(a)(1)(A), (A)(i). State and local officials must take steps to ensure the records "are accurate and are updated regularly." *Id.* § 21083(a)(4); *see also id.* § 21083(a)(2)(A), (a)(2)(B)(i)-(iii).

Pennsylvania, following these commands, maintains a voter database and its own programs and activities to ensure that voter registration records are accurate and updated regularly. *See, e.g.*, 25 PA.C.S. §§ 1201(3), 1203, 1222, 1401, 1403-04, 1501-03, 1505-12, 1514. The ultimate product of these programs and activities is the HAVA-mandated official statewide voter list. While Pennsylvania makes most voter data publicly available, it restricts how that data may be used. For example, it makes two types of lists—"street lists" and "public information lists"—publicly available for inspection, and in the case of street lists, available for copy. 4 PA. CODE §§ 183.13, 183.14. But requesters may not publicly share either list with their political associates on the Internet. *Id.* §§ 183.13(g), 183.14(k) ("Internet Sharing Ban").

Pennsylvania also maintains a Full Voter Export List ("Voter List"),[1] which contains the most voter information of any list and includes: "voter ID number, name, sex, date of birth, date registered, status (active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (congressional, legislative, school district, etc.), voter history, date the voter's record was last changed, and phone number if the voter provided it on the application." **Appx121-122**. It omits driver's license numbers, social security numbers, digitized signatures, ballot choices, and other confidential information. The Voter List is available for purchase. **Appx121-122**. However, to complete a request, a requester must submit an affirmation agreeing to, among other things, comply with the Internet Sharing Ban: "I further affirm that I will not publish any of the above lists on the Internet, as such publication is prohibited by 4 Pa. Code sections 183.13 (g) & 183.14 (k)." **Appx121-122, Appx124-125**.

The Secretary of the Commonwealth ("the Secretary"), who is the chief elections officer, admits the only governmental interests in this Ban are "voter privacy" and participation. **Appx112, Appx669-670**. But the Secretary has also conceded that the Ban does not prohibit a requester from broadly disseminating the information in other ways, such as by mailing or emailing it to everyone in the

---

[1] VRF refers to street lists, public information lists, and the Voter List collectively as the "lists."

Commonwealth or even posting it on a website with national reach so long as a login is required. **Appx307-314, Appx318-321**.

Appellant Voter Reference Foundation, LLC ("VRF") is a nonpartisan nonprofit company whose mission is to increase voter participation and transparency in elections at all levels so that the public can remain informed regarding electoral processes, ensure the integrity of elections across the country, and increase confidence in those elections, thereby increasing participation in the electoral process. **Appx392, Appx398-399**.

VRF has two related but distinct projects, which it intends to conduct in Pennsylvania if it can obtain the necessary voting data. For the first project, VRF collects and shares voter data online with citizens, and then encourages citizens to associate with VRF and each other to review states' voter rolls, identify errors, and report them to the appropriate election authorities. **Appx160-161, Appx398-399, Appx415-416, Appx432-434, Appx438-439, Appx706 ¶¶8-9**. In this manner, VRF's website "crowd-sources" the rectification of errors in the voter rolls. **Appx432-434, Appx438**. VRF also encourages voters to check their own registration data to ensure they are properly registered to vote. **Appx706-707 ¶11**. This process helps ensure no citizen is deprived of the right to vote. **Appx399-400**. VRF has posted 35 states and D.C. on VoteRef.com but hopes to post all 50 states. **Appx 706-706 ¶¶6-7**.

For VRF's second project, its in-house election professionals directly petition and lobby state election officials after analyzing and comparing state voter records. **Appx403, Appx706 ¶10**. Specifically, VRF election professionals compare the total number of ballots cast in an election to the number of voters credited as voting in their vote history file. **Appx403**. VRF also conducts interstate voter roll evaluations to identify voters who might be registered in more than one state and to provide this analysis to state election officials. **Appx707 ¶12**. VRF then engages states' chief election officials to discuss VRF's analysis of states' records, including any discrepancies, and best practices for voter record maintenance. **Appx403, Appx706 ¶10**. Through this process, VRF has identified discrepancies in other states (Colorado, Alabama, Nevada, and Georgia) and worked with state officials to reconcile those differences. **Appx496-497**. This advocacy and participation in list maintenance is central to VRF's mission, and it would do these activities in Pennsylvania if it could obtain current records. **Appx706-707 ¶¶10, Appx14, Appx116 ¶¶11-12**. But unfortunately, Pennsylvania's actions have prevented VRF from fulfilling its mission to increase voter participation and secure voters' rights to electoral integrity. **Appx392, Appx398-399, Appx707 ¶¶ 13-14**.

VRF obtained the Pennsylvania Voter List several years ago. **Appx115 ¶5**. (VRF has never acquired nor does it seek confidential information withheld from the Voter List.) Prior to posting any data on its website, on August 19, 2021, VRF

11

emailed the Secretary its analysis of Pennsylvania's records, including a comparison of the total ballots cast in the 2020 election and the number of registered voters in the Commonwealth. **Appx127-129**. The Secretary never responded. **Appx115 ¶8**. VRF subsequently posted the Voter List to its website, VoteRef.com. **Appx115 ¶¶5, 9**. While the data was posted, several VoteRef.com users told VRF that their information in the Secretary's Voter List was incorrect. **Appx709-714**.

On January 21, 2022, Pennsylvania Department of State Chief Counsel Timothy Gates sent a letter to VRF demanding that Pennsylvania data on VoteRef.com be removed and accusing VRF of violating Pennsylvania law. **Appx131**. Specifically, the letter demanded that VRF "take immediate action to remove all Pennsylvania-voter information from VoteRef.com and any other related websites under their custody or control." **Appx131**. The sole reason for the demand was the Internet Sharing Ban. **Appx131, Appx278-279**. VRF removed the Pennsylvania Voter List from VoteRef.com because of this threat. **Appx456, Appx464**. Afterwards, several Pennsylvania voters contacted VRF expressing disappointment that they were no longer able to review Pennsylvania's records to identify errors. **Appx709-714**. VRF has not reposted the data since. **Appx336**.

VRF then sent two NVRA requests to the Secretary for certain records, including Pennsylvania's Voter List. **Appx133-143, Appx160-161**. VRF agreed that it would use the data solely for purposes permitted by law and not for commercial

purposes. **Appx133-143, Appx160-161**. VRF also specified how it would use the data for its two projects in its final request. **Appx160-161**. VRF did not sign the affirmation, however, because it could not agree to comply with the Internet Sharing Ban. **Appx133-143, Appx160-161**. The Secretary refused the requests *solely* because VRF planned to share the records with VoteRef.com users. **Appx357**. VRF then provided notices of violation under the NVRA. **Appx163-165, Appx167-169**.

VRF filed the present lawsuit against the Secretary on February 19, 2024. **Appx63**. The parties subsequently filed cross-motions for summary judgment. **Appx60**. Several months later, the Secretary filed a motion to dismiss under FED. R. CIV. P. 12(h)(3), arguing for the first time that VRF lacked standing to pursue its claims related to the denial of its NVRA requests. **Appx682-684**. On April 23, 2026, the Court granted the Secretary's motion for summary judgment, finding that VRF lacked standing to pursue two claims (Counts II and III, regarding the denial of the NVRA requests) and that the remaining claims failed on the merits; denied VRF's motion for summary judgment; and having decided the standing issue in its memorandum, dismissed the Secretary's motion to dismiss as moot. **Appx53-55**. VRF filed a timely notice of appeal on May 22, 2026. **Appx56**.

## SUMMARY OF THE ARGUMENT

**I.** The district court correctly found that VRF has standing to pursue Counts I, IV, and V based on its injury from a credible threat of prosecution if VRF continued

to post voter data on its website. But the district court erroneously concluded that VRF lacked standing for its access claims (Counts II and III)—which alleged that the Secretary violated the NVRA in denying VRF's two requests for the Voter List. These denials resulted in five separate downstream consequences to VRF that bear a "nexus to the interest Congress sought to protect" in the NVRA. *Kelly v. RealPage Inc.*, 47 F.4th 202, 214 (3d Cir. 2022). VRF thereby suffered a cognizable injury to demonstrate Article III standing for those claims.

**II.** The district court rightly determined that the Voter List is a "record" that must be produced under the NVRA. Nonetheless the district court concluded that the Secretary could deny VRF's Voter List requests with a mere citation to Pennsylvania's Internet Sharing Ban because the Ban does not stand as an obstacle to the NVRA's purposes. In doing so, it departed from the holdings of two sister-circuit courts who have previously held that similar bans were preempted by the NVRA. *Voter Ref. Found., LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025); *PILF, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024). This was erroneous. The NVRA establishes a broad right of disclosure to effectuate its purposes of "protect[ing] the integrity of the electoral process" and "maintain[ing] accurate and up-to-date voter registration rolls." *Torrez*, 160 F.4th at 1081 (citing 52 U.S.C. § 20501(b)). The Ban stands in the way of these goals by prohibiting online disclosure, a key tool for VRF and voters

to ensure transparency and accuracy in the voter rolls. The district court's refusal to look to these codified statutory purposes as part of its analysis is reversible.

**III.** The district court did not reach the merits of the access claims upon finding that VRF lacked standing. But because VRF has standing and these claims were briefed by the parties below, this Court can decide the issue now. VRF should prevail because (1) as even the district court acknowledges, the NVRA has a broad right of disclosure entitling VRF to Pennsylvania's Voter List, and (2) the Internet Sharing Ban (the only reason the Secretary denied VRF's requests) is preempted.

**IV.** The district court's determination that the First Amendment did not apply to VRF's claims was also erroneous. The Secretary's Internet Sharing Ban and takedown letter have forced VRF to remove protected speech from its website due to a fear of prosecution and have barred VRF from obtaining and posting further information. These actions have thwarted VRF's protected political speech and have imposed an overbroad restriction that prohibits far more speech than necessary to serve any legitimate purposes. Moreover, these actions cannot satisfy strict scrutiny because they neither serve a compelling interest nor are narrowly tailored.

**V.** Finally, VRF is entitled to reversal on its claims for permanent injunctive and declaratory relief. The Court denied declaratory relief on the grounds that VRF failed to prove its other claims. Because the other claims demand reversal, this one does too.

<u>**STANDARD AND SCOPE OF REVIEW**</u>

Summary judgment must be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Evidence is viewed "in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor." *Thomas v. Cumberland County*, 749 F.3d 217, 222 (3d Cir. 2014) (citation omitted). A court may only dismiss a case pursuant to FED. R. CIV. P. 12(h)(3) if it determines that it lacks subject matter jurisdiction.

This Court reviews questions of law, including questions of jurisdiction and disposition of a summary judgment motion, de novo and factual determinations for clear error. *Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 414 (3d Cir. 2013); *Thomas*, 749 F.3d at 222.

<u>**ARGUMENT**</u>

I. **VRF HAS STANDING TO VINDICATE ITS CLAIMS.**

To demonstrate standing, "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo v. Robins*, 578 U.S. 330, 338 (2016). No one contends that VRF cannot meet the traceability or redressability prongs. The dispute centers on whether VRF has suffered an injury-in-fact.

When it comes to informational injuries, *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), provides further guidance. "[T]o state a cognizable informational injury a plaintiff must allege that 'they failed to receive . . . required information,' and that the omission led to 'adverse effects' or other 'downstream consequences,' and such consequences have a nexus to the interest Congress sought to protect." *Kelly*, 47 F.4th at 214 (quoting *TransUnion*, 594 U.S. at 441-42) (citation omitted).

This is a "low evidentiary hurdle." *PILF v. Sec'y Commonwealth of Pa.*, 136 F.4th 456, 469 (3d Cir. 2025) ("*PILF*") (citation omitted). In other words, "although plaintiffs at the summary judgment stage must set forth specific facts by affidavit or other evidence supporting standing, the requirement of a downstream consequence required by *TransUnion* is '*not burdensome.*'" *Id.* (quoting *Campaign Legal Ctr. v. Scott*, 49 F.4th 931, 940 (5th Cir. 2022) (Ho, J., concurring)) (cleaned up) (emphasis added). A plaintiff need only show an "adverse downstream consequence for its mission or future plans that has a nexus to the interest Congress sought to protect in enacting the NVRA." *PILF*, 136 F.4th at 456 (citation omitted). For example, in a concurrence on which this Court relied in *PILF*, Judge Ho of the U.S. Court of Appeals for the Fifth Circuit noted that *TransUnion* can be satisfied by showing "the information is necessary to engage in public advocacy about a pressing matter of policy" or "is essential to furthering Plaintiffs' mission." *Scott*, 49 F.4th at 940 (Ho, J., concurring); *see also PILF*, 136 F.4th at 469 (relying on this opinion). "[P]roof

that the defendant's hindrance of '[a plaintiff's] mission to *protect the voting rights* of various communities' might suffice as a downstream consequence under the NVRA." *PILF*, 136 F.4th at 469 (quoting *Scott*, 49 F.4th at 940 (Ho, J., concurring)). And downstream consequences are not limited to those precise circumstances: "There may be any number of ways that Plaintiffs . . . can establish a 'downstream consequence' that they will suffer if denied the information they seek." *Scott*, 49 F.4th at 940 (Ho, J., concurring).

Likewise, demonstrating that a downstream consequence bears a nexus to an interest Congress sought to protect is a meager showing. The plaintiff need only show "the information has *some relevance* to an interest of the litigant that the statute was intended to protect." *Kelly*, 47 F.4th at 213 (quotation omitted) (emphasis added). The NVRA has four broad purposes:

> (1) to establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;
> (3) to protect the integrity of the electoral process; and
> (4) to ensure that accurate and current voter registration rolls are maintained.

52 U.S.C. § 20501(b); *see also PILF*, 136 F.4th at 467. Thus, a plaintiff need only show that the consequence is related to one of these purposes to demonstrate injury.

VRF's claims can be split into two buckets: (A) its access claims (Counts II and III), which state an informational injury, and (B) its advocacy claims (Counts I, IV-VI), which state an independent injury. VRF has standing for all.

**A. VRF Has Standing for Its Access Claims.**

The district court concluded that VRF lacked standing to pursue its access claims (Counts II and III). But that is incorrect. VRF meets the standard for informational injuries because the Secretary failed to provide VRF with "'required information,'" which "led to 'adverse effects' or other 'downstream consequences,' and such consequences have a nexus to the interest Congress sought to protect." *Kelly*, 47 F.4th at 214 (quoting *TransUnion*, 594 U.S. at 441-42) (citation omitted).

Everyone seems to agree that the Secretary denied VRF's requests for access to NVRA-"required information." Specifically, on March 7, 2022, and November 2, 2023, VRF sent the Secretary letters requesting the Voter List and accompanying data, which qualify as "records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). The Secretary failed to provide this information in response as required by the statute.

The real dispute is over whether these rejections led to adverse effects or downstream consequences which bear a nexus to an interest Congress sought to protect. Here, VRF easily meets this threshold. The Secretary's denial of VRF's

19

requests resulted in several downstream consequences that thwarted VRF's promotion of voter list maintenance, election integrity, and voter participation—all express NVRA purposes. Specifically, the Secretary's refusal to provide VRF the requested NVRA records (1) blocked VRF from reviewing the records and associating with VoteRef.com users to identify errors in state voter rolls; (2) blocked VRF's efforts to enable voters to ensure they were properly registered to vote; (3) blocked VRF's efforts to engage with and lobby the Secretary for better list maintenance; (4) chilled VRF's political speech of sharing the records VRF already had and discussing the Commonwealth's list maintenance efforts; and (5) prevented VRF from fulfilling its mission of increasing voter participation and preserving election integrity. These activities are all "essential to a concrete interest protected by the statute." *PILF*, 136 F.4th at 467.

On the first point, the Secretary's refusal to provide VRF with the Pennsylvania records impedes VRF's ability to find errors in the voter rolls and enable Pennsylvanians to do the same. **Appx706 ¶¶8-10**. In most states, VRF shares the data it obtains with its associates on VoteRef.com, which empowers the public to join VRF's review to promote election integrity and the accuracy and currency of voter rolls. **Appx116-117 ¶15**. But not in Pennsylvania.

The Secretary's action and the consequences thereof clearly thwart the NVRA's core purposes. NVRA's public disclosure provision requires the

Commonwealth to "make available for public inspection . . . all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i)(1). Making all such records, including VRF's requested voter data, available to VRF for its requested usage is clearly related to at least two statutory purposes: "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained." *Id.* § 20501(b)(3)-(4); *see also Voter Ref. Found., LLC v. Galvin*, No. 24-CV-12592-DJC, 2026 WL 836855, at *5 (D. Mass. Mar. 26, 2026); *Bellows*, 92 F.4th at 54-55; *Proj. Vote/Voting for Am., Inc. v. Long*, 682 F.3d 331, 339 (4th Cir. 2012) ("It is self-evident that disclosure will assist the identification of both error and fraud in the preparation and maintenance of voter rolls.").

Second, the Secretary's refusal hinders VRF's efforts to empower voters to verify their registration information, which in turn "protect[s] the integrity of the electoral process" and "ensure[s] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4); **Appx706-707 ¶11**. In doing so, VRF uses this information to ensure citizens can exercise their rights to vote. As this Court noted in discussing *Scott*, a "defendant's hindrance of 'Plaintiffs' mission to protect the voting rights of various communities' might suffice as a downstream

21

consequence under the NVRA." *PILF*, 136 F.4th at 468 (quoting *Scott*, 49 F.4th at 940 (Ho, J., concurring)).

Third and fourth, the Secretary's efforts have essentially silenced VRF's advocacy and lobbying efforts; VRF can no longer share records it has, review and share information about the Commonwealth's efforts to maintain accurate lists, or lobby the Secretary in furtherance of the same. VRF uses state records to conduct a discrepancy analysis—*i.e.* a comparison of total ballots cast in an election to the number of registered voters in the Commonwealth. **Appx706 ¶10, Appx127-129**; *see also Torrez*, 160 F.4th at 1074. VRF then uses that analysis to lobby state election officials for better recordkeeping procedures in furtherance of the NVRA purpose of "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(4); **Appx706 ¶10**. It also analyzes the rolls to identify voters that are potentially registered in multiple states so that it can provide states with reports about those potential duplicates. **Appx707 ¶10**. But absent the "necessary" records, VRF cannot "engage in [this] public advocacy about a pressing matter of policy" in the Commonwealth. *Scott*, 49 F.4th at 940 (Ho, J., concurring) (finding *TransUnion* could be satisfied by showing "the information is necessary to engage in public advocacy about a pressing matter of policy"); *Akins*, 524 U.S. at 21 (finding injury in fact from denied election information request where "[t]here is no reason to doubt [plaintiffs'] claim that the information would help them (and others to whom they

would communicate it) to evaluate candidates for public office"); **Appx707 ¶¶ 13-14**. As the District of Massachusetts recently found:

> [T]he Secretary's denial of voter data to which it is entitled under the NVRA prevents VRF from carrying out its mission of engaging with the public to ensure the accuracy and currency of state voter rolls and also prevents it from lobbying election officials to correct errors before additional elections take place. These injuries cannot be remedied by monetary damages.

*Galvin*, 2026 WL 836855, at *13 (cleaned up). Such advocacy efforts were wholly absent from *PILF*. Accordingly, VRF has demonstrated a sufficient downstream consequence related to a congressional purpose. *Scott*, 49 F.4th at 940 (Ho, J., concurring).

Finally, the Secretary's actions have prevented VRF from fulfilling its mission to increase voter participation and secure voters' rights to electoral integrity. **Appx392, Appx398-399, Appx707 ¶¶ 13-14**; *cf. Torrez*, 160 F.4th at 1078 (observing that VRF wants to engage in the speech of publishing voter data on its website "to further its organizational purpose"). This, too, is a sufficient downstream consequence. *PILF*, 136 F.4th at 469; *Scott*, 49 F.4th at 940 (Ho, J., concurring).

In sum, in refusing to turn over critical information, the Secretary's actions resulted in downstream consequences, which bear a nexus to concrete interests Congress intended to protect under the NVRA.[2]

### 1. Courts have found standing in similar circumstances.

Other courts have confirmed this result and held that VRF and entities like VRF have standing to pursue NVRA claims in nearly identical circumstances.

Recently, the District of Massachusetts, following and relying heavily on First Circuit precedent in *Bellows*, held that VRF had standing under the NVRA to challenge Massachusetts' refusal to provide VRF with voter data to engage in the same activities it seeks to do here. *Galvin*, 2026 WL 836855, at *3. Observing that since *TransUnion*, circuits have split over whether a heightened standing requirement applies to informational injuries, the court determined VRF satisfied even the "heightened" standing test applied in *PILF*. *Id.* at *5.

---

[2] VRF's presence outside Pennsylvania has no impact on this analysis. The statutory text does not discriminate between in-state and out-of-state organizations. 52 U.S.C. §§ 20507(i), 20510(b); *see also Galvin*, 2026 WL 836855, at *6. Courts across the country have concluded that out-of-state organizations have standing in similar circumstances. *See, e.g., Bellows*, 92 F.4th at 50-51; *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1033 (D.N.M. 2024), *aff'd*, 160 F.4th 1068 (10th Cir. 2025); *Long*, 682 F.3d at 333; *Galvin*, 2026 WL 836855, at *6 (collecting cases). And, relatedly, multiple courts have held that the NVRA preempts state attempts to limit record access to in-state requesters. *See, e.g., Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019); *PILF, Inc. v. Knapp*, 749 F. Supp. 3d 563, 572 (D.S.C. 2024), *remanded on other grounds, PILF, Inc. v. Wooten*, 164 F.4th 362 (4th Cir. 2026).

*Galvin* held that VRF sufficiently demonstrated several downstream consequences caused by the denial of its NVRA records requests, which bear a nexus to the NVRA's purposes. *Id.* Specifically, VRF had shown "a range of adverse effects from the alleged denial of its requested data that are also relevant to NVRA's purpose of 'ensur[ing] that accurate and current voter registration rolls are maintained'" including the "inability to share the data online so interested citizens, including Massachusetts voters, can review the data and help identify and report inaccuracies or inconsistencies" and "the inability to conduct comparative analysis on voting history." *Id.* at *6 (cleaned up).

Likewise, in *Torrez*, the Tenth Circuit held that VRF had standing to challenge New Mexico's similar refusal to provide VRF with voter records to engage in the same activities it seeks to do here. 160 F.4th at 1078. *Torrez* viewed VRF's injury as resting not merely on a denial of information, as with the Third Circuit plaintiffs in *PILF*, but also on the chilling effect of the State's prohibition. *Id.* VRF faced a credible threat of prosecution if it violated New Mexico's data sharing ban—which VRF argued was preempted by the NVRA—that kept VRF from "exercising its First Amendment right to publish voter data on its website for free." *Id.* In short, VRF wished to engage in speech to further its mission and the State was willing to prosecute it for doing so. *Id.* This was sufficient to show a concrete injury for its NVRA claims. *Id.*

Finally, and most recently, in *PILF, Inc. v. Nago*, 174 F.4th 664 (9th Cir. 2026), the Ninth Circuit found that a plaintiff organization had standing to challenge Hawaii's denial of its NVRA request. *Id.* at 670.

Here, just as in *Torrez*, *Galvin*, *Bellows*, and *Nago*, VRF requested records which must be produced under the NVRA, and the Secretary refused to produce them. Just as it did in *Galvin*, VRF has adequately demonstrated the "downstream consequences" it is suffering and will continue to suffer as a result of the Secretary's refusal to produce the requested records, all of which directly relate to the NVRA purposes of "protect[ing] the integrity of the electoral process and "ensur[ing] that accurate and current voter registration rolls are maintained." 52 U.S.C. § 20501(b)(3)-(4). And, just as in *Torrez* and *Bellows*, VRF is injured by the Commonwealth's credible threat of enforcement that actively chills VRF's NVRA-sanctioned speech.

### 2. *VRF is distinct from* PILF v. Sec'y of Commw. of Pa.

The district court wrongly determined that this case was on all fours with *PILF v. Secretary Commonwealth of Pennsylvania*, and therefore, like PILF there, VRF lacks standing here. But this case tracks the aforementioned cases in the First, Ninth, and Tenth Circuits—not *PILF*.

In *PILF*, the plaintiff urged "that the denial of the right to the information, *without more*, is enough for standing" and "that it need not show more than that it

sought and was denied specific agency records." 136 F.4th at 461-62 (emphasis added) (quotation omitted) (cleaned up). And even though the plaintiff attempted to identify some downstream consequences (*i.e.*, the plaintiff could not "study and analyze the [Secretary's] voter list maintenance activities," the plaintiff could not produce and disseminate "educational materials," and the plaintiff "expended considerable time and financial resources" in making records requests, *id*. at 467 (quotation omitted)), none of these consequences were adequately supported or necessarily tied to congressional purposes. Much of the district court's findings came down to the dearth of evidence. It made repeated references to the bare "record" and lack of "evidence" before it. *See, e.g., id*. at 468-69. For example, the court held "there is no evidence in the record that, despite the Secretary's purported noncompliance with the NVRA, PILF was unable to publish educational materials" and PILF, in fact, "touted its ability to publish" materials "based on records it obtained." *Id*. at 468 (citation omitted). So the court concluded: "On this record, the Secretary's actions did not appear to affect PILF's ability to access any resources that it had previously and successfully used to generate its educational materials." *Id*. Likewise, the Court "note[d] that PILF submitted no evidence of any specific plans for the records it sought relating to the purpose of the NVRA." *Id*. (citation omitted). The Court therefore held that it could not find standing based on such a "threadbare record." *Id*. at 469 (citation omitted).

While part of VRF's work might start with research like PILF's, VRF has established a track record of doing far more with its analysis. Unlike PILF, VRF has submitted "evidence of . . . specific plans for the records it sought relating to the purpose of the NVRA." *Id.* at 468 (citation omitted). VRF has gone beyond "[a] general desire to audit a state's NVRA records" to "concrete plans to act upon information contained in the records in a manner consistent with the purpose of the statute," which were missing in *PILF*. *Id.* at 469. VRF does not merely seek to publish "educational materials." *Id.* at 468. Rather, VRF uses this data as a stepping stone to advance its mission to protect election integrity, encourage voter participation, and "protect the voting rights of various communities." *PILF*, 136 F.4th at 468 (quoting *Scott*, 49 F.4th at 940 (Ho, J., concurring)) (noting that protecting voting rights as part of an organizational mission "might suffice as a downstream consequence under the NVRA"). VRF uses the data it receives "to engage in public advocacy about a pressing matter of policy." *Scott*, 49 F.4th at 940 (Ho, J., concurring); *see, e.g.*, **Appx127-129**. VRF lobbies state officials based on its analysis of state records and speaks and associates with Pennsylvania voters and others to fix list errors. The record shows that concerned citizens used VRF's published Pennsylvania data to identify errors, just as intended. **Appx709-714**. Pennsylvania voters have thereby suffered from the Secretary's actions and the takedown letter. *Cf. PILF*, 136 F.4th at 467 (noting PILF did not show its lack of

access to the records "hindered its own participation in the electoral system or the expansion of voter participation in federal elections generally").

Moreover, unlike in *PILF*, the Secretary has threatened VRF with enforcement action and has chilled VRF's NVRA-sanctioned data-sharing speech as a result. **Appx131**. VRF has not just lost research material. It has been fully blocked from pursuing its mission of encouraging election integrity and voter participation in Pennsylvania—both purposes of the NVRA; from petitioning the Commonwealth for changes to its voter list maintenance; and from associating with and speaking alongside Pennsylvanians who desire to correct errors in their own voter data. VRF has clearly shown "adverse downstream consequence for its mission or future plans that has a nexus to the interest Congress sought to protect in enacting the NVRA." *PILF*, 136 F.4th at 456.

### 3. *To the extent* PILF *departed from Supreme Court precedent, it was wrongly decided.*

Finally, assuming *PILF* is not distinguishable on multiple grounds (it is) and compels a finding of no standing here (it doesn't), that's only because it veers from binding Supreme Court precedent.

For one, *PILF* focused on one NVRA purpose (increasing voter participation) to the exclusion or minimization of the other three. 136 F.4th at 467; *see also Torrez*, 160 F.4th at 1083 (noting it is erroneous to rank one purpose over others because "Congress did not rank the importance of the enumerated purposes in the NVRA in

29

that way"). It also claimed that public disclosure is only "part" of the statute, *id.* at 465, while other courts have emphasized that it is the essential tool to carry out all four purposes, *see, e.g., Bellows*, 92 F.4th at 54-55; *Long*, 682 F.3d at 340; *Torrez*, 160 F.4th at 1081-84.

And since the district court issued its memorandum and order, the U.S. Court of Appeals for the Ninth Circuit affirmed an organization's standing to bring an NVRA challenge in *Nago*. There, the Ninth Circuit noted that the NVRA "creates a broad public right to obtain information about the government," so "the denial of a request for information made pursuant to that statute causes an injury in fact." *Nago*, 174 F.4th at 670. In reaching this conclusion, the Court analyzed *Public Citizen v. U.S. Dept. of Just.*, 491 U.S. 440 (1989), *FEC v. Akins*, 524 U.S. 11 (1998), and *TransUnion*, all of which established that a plaintiff need only show adverse effects for informational injuries, like those in *TransUnion*, but not for all informational injuries, particularly those where the government has denied all information. *Nago*, 174 F.4th at 671-73. The Ninth Circuit noted (and VRF agrees) that to the extent the Third Circuit in *PILF* departed from these precedents, it was wrongly decided. *Id.* at 675.

## B. VRF Has Standing to Pursue Its Remaining Claims.

The district court did, however, correctly determine that VRF has standing for Counts I, IV, and V. **Appx27-30**. The injuries for these Counts are not informational.

30

Rather, they arise due to a credible threat of prosecution. As the district court found, the Department of State's takedown letter (**Appx131**) demonstrates that VRF faces a credible threat of prosecution for publishing voter data already in its possession. **Appx27-29, 131**. As in *Torrez*,

> This credible threat of prosecution has chilled VRF from exercising its First Amendment right to publish voter data on its website for free. Throughout this litigation, VRF has expressed that it wishes to engage in such speech to further its organizational purpose; but the fear of criminal investigation and prosecution forced VRF to remove the New Mexico voter data from its website. . . . [T]hese circumstances sufficiently establish VRF's standing—the undisputed facts show that there is a concrete injury in fact 'caused' by the State's willingness to prosecute VRF, which can be redressed by a favorable decision.

160 F.4th at 1078; *see also Bellows*, 92 F.4th at 50-51.

## II. THE NVRA PREEMPTS THE INTERNET SHARING BAN.

On the merits of VRF's preemption claim (Count I), the district court correctly determined that the Voter List is a "'record' ensuring the accuracy and currency of information pertaining to eligible voters" under the NVRA, 52 U.S.C. § 20507(i), that must be made available. **Appx34-35** (collecting cases); *see also Bellows*, 92 F.4th at 45-49 (holding Maine voter registration list must be available under the NVRA); *Torrez*, 160 F.4th at 1084-85 (holding requested New Mexico voter data was a "record"); *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 105 F.4th 1324, 1331-32 (11th Cir. 2024) (holding requested Alabama voter data was a

"record"). The Secretary did not seriously contest this point on summary judgment. Therefore, the Secretary must produce the Voter List under the NVRA.

But the Secretary withheld the Voter List by mere citation to the Commonwealth's Internet Sharing Ban. And the district court determined that the NVRA does not preempt the Internet Sharing Ban because the Ban is not an obstacle to NVRA purposes. This conclusion was incorrect.

Obstacle preemption is one form of implied preemption under the Supremacy Clause. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). It operates where a state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Id.* "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* "If the purpose of the act cannot otherwise be accomplished—if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect—the state law must yield to the regulation of Congress within the sphere of its delegated power." *Id.* (citation omitted). No presumption against preemption applies to the NVRA, *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 14 (2013), because the Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" and the "assumption that Congress is reluctant to pre-empt does not hold when Congress acts" thereunder. *Id.* at 14; *see also Harkless v. Brunner*, 545 F.3d 445, 455 (6th Cir.

2008) (presumption does not apply to NVRA); *Fish v. Kobach*, 840 F.3d 710, 731-32 (10th Cir. 2016) (same); *Bellows*, 92 F.4th at 52 (same); **Appx37** (same).

Against this background, the NVRA preempts a range of state laws. *See, e.g., Inter Tribal*, 570 U.S. at 11-13 (proof of citizenship); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1354 (11th Cir. 2005) (limitations on acceptance of voter registrations); *Project Vote v. Blackwell*, 455 F. Supp. 2d 694, 703 (N.D. Ohio 2006) (requirements for registration workers). This includes state limitations on non-profits' access to voter data. *Bellows*, 92 F.4th 36; *Torrez*, 160 F.4th 1068; *Galvin*, 2026 WL 836855; *Jud. Watch v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019); *PILF, Inc. v. Matthews*, 589 F. Supp. 3d 932, 940 (C.D. Ill. 2022).

The place to begin is the statutory text. As explained, the NVRA has codified four statutory purposes—"to increase the number of registered voters by establishing certain procedures, protect the integrity of the electoral process, and maintain accurate and up-to-date voter registration rolls." *Torrez*, 160 F.4th at 1081 (citing 52 U.S.C. § 20501(b)). To effectuate these broad purposes, the NVRA has a Public Disclosure Provision, which provides, in relevant part:

> (1) Each State shall maintain for at least 2 years and *shall make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to

> the identity of a voter registration agency through which
> any particular voter is registered.

52 U.S.C. § 20507(i) (emphases added). And the NVRA has a private right of action to empower private citizens to enforce this disclosure mandate. *Id*. § 20510(b). As such, the "NVRA 'embodies Congress's conviction that Americans who are eligible under law to vote have every right to exercise their franchise, a right that must not be sacrificed to administrative chicanery, oversights, or inefficiencies.'" *Bellows*, 92 F.4th at 52-53 (quoting *Long*, 682 F.3d at 334-35). It "assist[s] the identification of both error and fraud in the preparation and maintenance of voter rolls." *Long*, 682 F.3d at 339. Prohibitions on disseminating voter data, which make it more difficult to identify error and fraud, directly contradict Congress's explicit objectives and create improper obstacles to its implementation.

Given these clear, codified statutory purposes, both the First and Tenth Circuits have determined that the NVRA preempts state internet sharing bans like Pennsylvania's.

In *Bellows*, the First Circuit held that Maine's similar internet sharing ban was "[in]consistent with the structure and purpose of the [NVRA] as a whole." 92 F.4th at 52 (citations omitted) (alterations in original). Discussing the Public Disclosure Provision, it noted:

> Such a provision evinces Congress's belief that public
> inspection, and thus public release, of Voter File data is
> necessary to accomplish the objectives behind the NVRA.

> Indeed, the analysis and subsequent dissemination of Voter File data to the public is necessary if members of the public, or organizations such as PILF, are ever to identify, address, and fix irregularities in states' voter rolls by exercising their private right of action under the NVRA. . . . To find otherwise would be to prevent the public from "protect[ing] the integrity of the electoral process" and "ensur[ing] that accurate and current voter registration rolls are maintained" throughout the states. 52 U.S.C. § 20501(b)(3)-(4).

*Id.* (citation omitted). The First Circuit rejected Maine's argument that the ban was valid because it promoted the NVRA's purpose of maximizing voter participation by protecting privacy: "even if the Publication Ban does further the NVRA's objective of enhancing the participation of eligible citizens as voters, it nonetheless creates an obstacle to the accomplishment and execution of the full purposes and objectives of Congress as stated in 52 U.S.C. § 20501(b)(1)-(4)." *Id.* at 55. The court observed that Congress already weighed the privacy risks against the strong interest in disclosure and that other federal laws adequately protected voters' privacy interests. *Id.* The District of Massachusetts recently followed this precedent in holding that VRF was entitled to the Massachusetts voter file and had a right to publish the file online despite similar attempts to prevent its publication via a "licensing agreement." *Galvin*, 2026 WL 836855, at *8.

Likewise, in *Torrez*, the Tenth Circuit confronted a similar ban. The Court looked to the NVRA purposes and the original meaning of the terms in the Public Disclosure Provision. *Torrez*, 160 F.4th at 1081. It concluded based on these words

that Congress' clear intent was to allow for broad circulation of voter data among members of the public to police fraud and inaccuracies on the voter rolls. *Id.* Any ban on internet sharing, therefore, would hinder these purposes.

The same is true here. Pennsylvania's Internet Sharing Ban directly undermines principles of public disclosure and scrutiny central to the NVRA and its requirement of publication of such records. The Ban is antithetical to and stands as an obstacle to the NVRA's purposes, so it is preempted.

## A. The District Court's Contrary Holding Was Erroneous.

The district court, nonetheless, departed from these holdings for several reasons. First, the district court wrongly determined that the four statutory purposes were irrelevant and cabined its analysis to the text of the Public Disclosure Provision. **Appx43-45**. But obstacle preemption turns *precisely* on what the "full purposes and objectives of Congress" were and whether the state law stands as an obstacle to those purposes. *Crosby*, 530 U.S. at 373. Moreover, Congress codified these four purposes, so they are a critical part of the statutory text at issue. 52 U.S.C. § 20501(b). And again, the Court must look to the full "federal statute as a whole," not one isolated provision. *Crosby*, 530 U.S. at 373. The First and Tenth Circuits' recognition of the statutory purposes in 52 U.S.C. § 20501(b) did not "expand[] the requirements of the statute beyond just its plain statutory text." **Appx45**. They *accounted* for the

statutory text. The district court's focus on a few words to the exclusion of the rest of the statute was erroneous.

Second, the district court held that the Public Disclosure Provision was not thwarted by the Internet Sharing Ban because the Provision "only requires the availability of the voting data for public inspection; it does not require its dissemination through public release or circulation." **Appx43-44**. It claimed the statute "only speaks of 'public inspection' and 'where available, photocopying.'" **Appx44** (quoting 52 U.S.C. § 20507(i)(1)). In doing so it adopted a narrow view of public inspection that the statute does not. Any definition of public inspection must be considered in light of the statute's broad, codified purposes.

"To 'inspect' is to 'look carefully into' or to 'view closely and critically.'" *Greater Birmingham Ministries*, 105 F.4th at 1332 (citing *Inspect*, Oxford English Dictionary (2d ed. 1989)). "To make something available for 'public' inspection, then, is to make it available in public, or to the public, for close scrutiny." *Id.* This language, the private right of action, "and the NVRA as a whole, make evident Congress's intent to support the transparency and circulation of voter data among the public to help detect and correct errors." *Torrez*, 160 F.4th at 1081-82 (citing *Bellows*, 92 F.4th at 54 (noting that Congress seemingly believes "that public inspection, and thus public release, of [voter] data is necessary to accomplish

37

the objectives behind the NVRA")). "In other words, critical scrutiny and public audits of voter data were envisioned by Congress in passing the NVRA." *Id.* at 1082.

The Internet Sharing Ban, therefore, "obstruct[s] the NVRA's primary goal of providing broad transparency and circulation of such voter data." *Id.* It "mak[es] voter data unavailable for close public scrutiny" through dissemination by private parties, which "thereby disrupts the purpose and intended effects of the NVRA." *Id.* (citing *Crosby*, 530 U.S. at 373; *Bellows*, 92 F.4th at 54). VRF's "analysis and subsequent dissemination of [voting] data to the public is necessary if members of the public, or organizations such as [VRF], are ever to identify, address, and fix irregularities in States' voter rolls by exercising their private right of action under the NVRA." *Bellows*, 92 F.4th at 54.

Third, the district court determined that the Public Disclosure Provision did not preempt the Internet Sharing Ban, which bars dissemination between private parties on the Internet, because anyone can purchase the Voter List from the Commonwealth. *Id.* at 39-41. The Tenth Circuit in *Torrez* confronted and responded to a similar objection. There, the State argued that its ban consisted with the NVRA because "only [*the State*], and not third parties like VRF, may exclusively provide access to voter data" under the NVRA. *Torrez*, 160 F.4th at 1083. But as the Tenth Circuit held, "nowhere does the NVRA require only state-to-party disclosures. To the contrary, the statute encourages broad and extensive public disclosure of relevant

records without restrictions on *who* provides it." *Id.* In other words, "Congress did not limit the role of 'providing access' to voter data solely to the individual States." *Id.* at 1084. "That makes sense because the consequent goal in widely circulating the voter data is so that any inaccuracies can be identified and corrected." *Id.* at 1083. Any such ban on sharing between private parties over the Internet, therefore, "counteracts and severely burdens the NVRA's enumerated purposes of public inspection and circulation of voter data by restricting the types of voter data that can be made publicly available and accessible." *Id.* at 1083-84. In other words, the Ban obstructs a key means of public inspection of voter data. As such, even if a State makes the data initially available for purchase, the State's attempts to restrict further dissemination of that data run into the NVRA's purposes. The Internet Sharing Ban, which does just that, is therefore preempted.

Finally, the district court relied heavily on *Greater Birmingham Ministries v. Secretary of State for Alabama*, 105 F.4th 1324 (11th Cir. 2024). But there, the court did not confront a preemption, much less an obstacle preemption, challenge, which expressly mandates the Court consider congressional purposes. *Crosby*, 530 U.S. at 373. And the case did not determine whether Alabama could erect barriers to dissemination of information once it produced the information, like the Internet Sharing Ban. The case only held that the NVRA did not facially require Alabama to electronically produce records, without examination of whether any state law stood

as an obstacle to Congress's objectives. *Greater Birmingham Ministries*, 105 F.4th at 1326.

## III.   VRF SHOULD PREVAIL ON ITS ACCESS CLAIMS.

This Court should also reverse the grant of summary judgment to the Secretary on VRF's access claims (Counts II and III). The district court did not reach the merits of these claims upon concluding that VRF had standing. But since these claims have been fully briefed before the district court and involve purely legal questions, with no outstanding factual disputes, they are properly before this Court on appeal. *Hudson United Bank v. LiTenda Mortg. Corp.*, 142 F.3d 151, 159 (3d Cir. 1998).

The NVRA Public Disclosure Provision requires Pennsylvania to make its lists, including the Voter List, publicly available. *See supra* Part II. VRF made two requests for that data and is thereby entitled to it under the NVRA. The Secretary's only stated basis to deny the requests was the Internet Sharing Ban. **Appx357**. VRF agreed to comply with all other conditions of the required affirmation. Because the Internet Sharing Ban is unlawful, *see supra* Part II, the Secretary's stated refusal is too. Accordingly, VRF is entitled to summary judgment on these claims.

## IV.   THIS COURT SHOULD REVERSE THE FIRST AMENDMENT HOLDINGS.

The district court also erred in granting summary judgment to the Secretary on VRF's First Amendment claims (Counts IV and V). VRF rightly argues that the Secretary's actions enforcing the Internet Sharing Ban (including its takedown letter

40

and recent denials) have two unconstitutional effects on VRF: (1) they prevent VRF from publishing data in its possession, and (2) they block VRF's access to new information. This execution of the Ban violates the First Amendment in at least two ways: (A) it unconstitutionally bans core political speech, and (B) it is overbroad.

## A. The Internet Sharing Ban Unconstitutionally Bars Political Speech.

### 1. Pennsylvania law bans political speech.

First, the Internet Sharing Ban triggers the First Amendment because it bars the transmission of voter information on the Internet, which is core political speech, and imposes a content-based restriction. The First Amendment provides: "Congress shall make no law . . . abridging the freedom of speech, or of the press; or of the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." U.S. CONST. AMEND. I. The Amendment safeguards speech and information dissemination on the Internet with the same vigor as those in a newspaper or town square. *Reno v. ACLU*, 521 U.S. 844, 868 (1997); *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 570 (2011) (discussing how "disclosing and publishing information . . . constitute speech" (quotation omitted)).

"The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 330 (2010). "[S]peech on public issues occupies the highest rung of the hierarchy of First

Amendment values, and is entitled to special protection," *Connick v. Myers*, 461 U.S. 138, 145 (1983), and "[t]he First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Snyder v. Phelps*, 562 U.S. 443, 452 (2011) (quotation omitted). "For these reasons, political speech must prevail against laws that would suppress it, whether by design or inadvertence. Laws that burden political speech are subject to strict scrutiny, which requires the Government to prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 58 U.S. at 340 (quotation omitted). "As a general matter, 'state action to punish the publication of truthful information seldom can satisfy constitutional standards.'" *Bartnicki v. Vopper*, 532 U.S. 514, 527 (2001) (quoting *Smith v. Daily Mail Pub. Co.*, 443 U.S. 97, 102 (1979)).

"Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015) (citation omitted). "Content-based laws are presumptively unconstitutional" and "subject to strict scrutiny." *Matter of Subpoena 2018R00776*, 947 F.3d 148, 155 (3d Cir. 2020) (citing *Reed*, 576 U.S. at 163-64).

Speech about and including voter data is protected political speech. For example, the Fourth Circuit held that a restriction on voter data usage implicated the

First Amendment because the data "is closely tied to political speech, which generally receives the strongest First Amendment protection," and "is a valuable tool for political speech." *Fusaro v. Cogan*, 930 F.3d 241, 250 (4th Cir. 2019) (citation omitted). In fact, the law required a person to use the voter data for purposes "related to the electoral process," so the voter data *had* to "be used to further such [political] speech." *Id.* (citation omitted).

Similarly, VRF's speech sharing Pennsylvania voter data is constitutionally protected political speech. Pennsylvania routinely makes voter data available to political parties and campaigns for political purposes. The Commonwealth even conditions access to the voter data, in part, on the data being used for political and election related purposes—reinforcing its connection to political speech. *Cf. id.* And Pennsylvania makes voter data available to companies who then sell that data to clients to turn a profit and advance particular ideologies. **Appx306-308, 313-314**. Simply put, voter data, specifically the Voter List, is political *by nature*, so VRF's dissemination of that data is plainly protected by the First Amendment.

Furthermore, even if discussing the data online was not political speech (it is), the Internet Sharing Ban still burdens VRF's core political speech because the underlying data is necessary to engage in such speech. *Meyer v. Grant*, 486 U.S. 414, 421 (1988). VRF posted (and intends to post) the data on VoteRef.com with a call to action for ordinary citizens to review the data, identify errors, and contact state

officers to fix them. **Appx398-99, Appx415-416, Appx430-435, Appx438-439**. VRF simultaneously conducted (and will conduct) its own review and lobbying efforts. In other words, VRF shared (and plans to share) the data to evaluate and potentially criticize the government alongside Pennsylvanians. VRF did and will do these activities to effectuate "political change." *Meyer*, 486 U.S. at 421 (holding that efforts to seek "political change" even if it does not involve overtly persuading a citizen that one's views are correct, is core political speech). As such, the First Amendment protects VRF's chosen means (*i.e.* sharing the underlying data) to advocate for its political cause. *Id*. at 424 (striking down ban because it barred the most effective speech, and "the First Amendment protects appellees' right not only to advocate their cause, but also to select what they believe to be the most effective means for so doing").

Pennsylvania's Ban inevitably burdens this speech. Even if Pennsylvania leaves open "other means" for VRF "to disseminate [its] ideas," it nonetheless "restricts access to the most effective, fundamental, and perhaps economical avenue for political discourse"—*i.e.* the Internet. *Id*. (citation omitted). "That [Pennsylvania] leaves open more burdensome avenues of communication, does not relieve its burden on First Amendment expression." *Id*. (quotation omitted). Pennsylvania's efforts to silence VRF's core political speech are therefore subject to strict scrutiny. *Citizens United*, 58 U.S. at 340.

Independently, Pennsylvania's restrictions on this type of speech are content based. The Ban exclusively forbids dissemination of voter data, not other forms of speech. Therefore, Pennsylvania's regulations of messages about this "particular subject matter" (*i.e.* voter information) are "subject to strict scrutiny." *Reed*, 576 U.S. at 163-64.

### 2. *The law cannot survive strict scrutiny.*

As stated, to satisfy strict scrutiny, the Secretary must show that the Internet Sharing Ban "furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 58 U.S. at 340 (quotation omitted). He cannot.

First, the Commonwealth has no compelling interest in the Ban. Its only stated interests are "voter privacy" and its alleged downstream impact on voter participation. **Appx112, Appx669-670**. But as the Supreme Court has held time and time again, "privacy concerns give way when balanced against the interest in publishing matters of public importance." *Bartnicki*, 532 U.S. at 534.

> "The right of privacy does not prohibit any publication of matter which is of public or general interest." The Right to Privacy, 4 Harv. L.Rev. 193, 214 (1890). One of the costs associated with participation in public affairs is an attendant loss of privacy. . . . The risk of this exposure is an essential incident of life in a society which places a primary value on freedom of speech and of press.

*Id.* (footnote omitted) (quotation omitted) (holding that publication restriction on lawfully obtained information could not survive strict scrutiny on privacy grounds

under the First Amendment). Here, VRF's interest in publishing political data so it can (alongside citizens) effectively lobby the government, correct errors, and effectuate political change is of paramount importance. Again, political speech is entitled to the highest form of First Amendment protection, so it outweighs any privacy interests in voter information.

In fact, Congress made this determination in crafting the Public Disclosure Provision. *Long*, 682 F.3d at 339. Even though "Section 8(i)(1) may conceivably inhibit voter registration in some instances," Congress nonetheless opted to "require[] public disclosure of personal information" largely to promote "transparency," "accountability," and "public confidence in the essential workings of democracy." *Id.* That "policy question" of how "to strike the proper balance between transparency and voter privacy" was "properly decided by" Congress in enacting the NVRA. *Id.* Thus, this Court "should be loath to reject a legislative effort so germane to the integrity of federal elections." *Id.* at 339-40.

Likewise, Congress determined that voter participation would be served rather than hurt by public disclosure. *Id.* at 339-40. Because disclosure "assist[s] the identification of both error and fraud in the preparation and maintenance of voter rolls," "[s]tate officials labor under a duty of accountability to the public" to maintain "the most accurate" voter rolls possible. *Id.* at 339. That transparency, in turn, promotes public confidence and participation. *Id.* at 339-40. And regardless of

whether Congress made the right choice, this policy decision was Congress' to make. *Id.* at 340 ("[T]his debate belongs in the legislative arena, not the courts."). This Court should not "revisit issues already resolved by the Congress." *Id.*

And even if Congress had not resolved the question in favor of transparency, the Secretary has failed to present concrete evidence that VRF's actions have tangibly harmed voters' privacy or participation. VRF takes substantial steps to protect the data it posts; for example, it requires users to agree with the site's terms of service, **Appx418-419**, blocks viewers from outside the United States from accessing the site, **Appx424-425**, and prevents data scaping, **Appx474**. The Secretary has yet to muster evidence of any Pennsylvanians who canceled their registrations because of VRF. **Appx354**.

Even if the Ban served a compelling interest, it would fail on narrow tailoring. Narrow tailoring requires using the "least restrictive means among available, effective alternatives." *Camp Hill Borough Republican Ass'n v. Borough of Camp Hill*, 101 F.4th 266, 271 (3d Cir. 2024). There must be "a close fit between ends and means." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quotation omitted). This Court has been clear: "[W]hen the government is ultimately responsible for the disclosure of information, imposing civil liability upon a newspaper for the subsequent publication of that information is not the most narrowly tailored means of serving any purported interest." *Bowley v. City of Uniontown Police Dept.*, 404

47

F.3d 783, 789 (3d Cir. 2005). The same is true for an internet publication like VoteRef.com. Thus, the Ban is not narrowly tailored.

The Ban also "fail[s] as hopelessly underinclusive," *Reed*, 576 U.S. at 171, because the Secretary admits that a requester could obtain the same data and mail it or email it to everyone in the Commonwealth, or even post it on a website so long as a login is required. **Appx307-314, Appx318-321**. "When a State attempts the extraordinary measure of punishing truthful publication in the name of privacy, it must demonstrate its commitment to advancing this interest by applying its prohibition evenhandedly, to the smalltime disseminator as well as the media giant." *The Fla. Star v. B.J.F.*, 491 U.S. 524, 540 (1989) (holding enforcement of a publication ban against certain forms of media but not others demonstrates that the ban does not satisfy strict scrutiny). In other words, the Commonwealth cannot attack the giant of the Internet but permit equally concerning forms of dissemination (*e.g.* mass email or website postings where a login is required) or even smaller scale distribution (*e.g.* one-to-one communication). The Ban "simply cannot be defended on the ground that partial prohibitions may effect partial relief"—even if the Ban stops *most* of the dissemination. *Id.* (citing *Daily Mail*, 443 U.S. at 104-05 (similar)) (citation omitted). Its "facial underinclusiveness" "raises serious doubts about whether [Pennsylvania] is, in fact, serving, with this statute, the significant interests which appellee invokes in support of affirmance." *Id.* "Without more careful and

inclusive precautions against alternative forms of dissemination," Pennsylvania's "selective ban on publication" solely on the Internet does not "satisfactorily accomplish[] its stated purpose." *Id.* at 541 (footnote omitted).

Moreover, there are other "available, effective alternatives" to protect voter privacy and encourage participation. *Camp Hill Borough*, 101 F.4th at 271. Pennsylvania already has two different programs for voters to protect their information, and VRF does not post data for protected voters. **Appx285-287, Appx402-403, Appx405, Appx472**. Pennsylvania could expand those programs. Relatedly, Pennsylvania laws prohibiting harassment, stalking, and election interference address concerns regarding misuse of data. 18 PA.C.S. § 2709 (criminalizing harassment); *id.* § 2709.1 (stalking); 25 PA.C.S. § 3527 (election interference). And federal protections exist to maintain the privacy of sensitive data, when necessary. *See, e.g.*, Privacy Act, 5 U.S.C. § 552a *et seq.*; Drivers Privacy Protection Act, 18 U.S.C. § 2721 *et seq.* Pennsylvania has done nothing to show that these more narrowly tailored protections are ineffective to address its concerns.

Regardless of the sensitivity of the voter data, the Commonwealth cannot restrict the free exercise of First Amendment rights. *Cf. The Fla. Star*, 491 U.S. at 537 (holding that restriction on publication of rape victim's name did not sufficiently advance privacy interests to satisfy strict scrutiny). The Ban cannot survive strict scrutiny.

## B. The Internet Sharing Ban Is Overbroad.

Second, the Internet Sharing Ban violates the First Amendment because it is overbroad. Specifically, it regulates and prohibits substantially more protected speech than necessary to accomplish any legitimate government interest. "The Constitution gives significant protection from overbroad laws that chill speech within the First Amendment's vast and privileged sphere." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 244 (2002). These concerns are especially strong where, as here, the statute imposes criminal sanctions. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003). Criminal sanctions may cause speakers, including VRF, to remain silent rather than communicate—even if their speech is protected. *See, e.g., Dombrowski v. Pfister*, 380 U.S. 479, 494 (1965).

"The first step in overbreadth analysis is to construe the challenged statute." *United States v. Williams*, 553 U.S. 285, 293 (2008). The parties agree, and the district court found, that the Internet Sharing Ban prohibits the publication of voter data on the Internet, regardless of whether the publication is for an otherwise permissible purpose. 4 PA. CODE § 183.14(k); **Appx5-6, Appx278-279, Appx289-290**.

Second, the Court must consider whether the Internet Sharing Ban proscribes "a substantial amount of protected expressive activity" relative to any plainly legitimate purpose served by the Ban. *Williams*, 553 U.S. at 297. The Ban's impact

on protected activities far outweighs its application to unprotected activities. That's particularly true given the Ban's conflict with federal law. *See supra* Part I. The Ban entirely forbids all online speech that shares voter data, much of which constitutes core political speech. The Ban's overbreadth deters VRF and others like it from engaging in speech protected by the First Amendment out of fear of prosecution. That unlawful sweep and chill is far broader than any legitimate applications. Accordingly, the Court should reverse on this claim.

### C. The District Court's Contrary Findings Were Erroneous.

The district court incorrectly determined that the Internet Sharing Ban merely limits access to information, rather than restricts political speech, and therefore is not subject to the First Amendment for either Count IV or V. **Appx46-47**. This argument fails for at least two reasons.

First, the Commonwealth's Ban restricts the publication of voter data to which VRF *already has access*. VRF obtained and published voter data on VoteRef.com, but it removed that data upon order from the Commonwealth in the takedown letter and Internet Sharing Ban. Elsewhere, the district court's memorandum acknowledges this fact: "When VRF accessed the full voter export list and published that data on the internet, it faced monetary fines or imprisonment under the confines of § 1707(a)(4)." **Appx29**. But the district court did not factor these findings into its First Amendment decision even though VRF directly addressed that point in its

51

summary judgment briefing. **Appx207**. Instead, the district court merely noted "that VRF is seeking voting data information within the Commonwealth's control." **Appx47**. The district court's critical omission of this undisputed fact is reversible. And because, as everyone agrees, the Ban also prohibits VRF's use of information in its possession, **Appx29**, access cannot be the linchpin of the Internet Sharing Ban. Publication is. Therefore, the Ban is an unconstitutional speech restriction. *Bartnicki*, 532 U.S. at 527 ("[I]f the acts of disclosing and publishing information do not constitute speech, it is hard to imagine what does fall within that category . . . ." (quotation omitted)).

Second, for any of its claims, VRF did not need to prove a First Amendment right of access to show a violation. Once a state makes or is legally required to make certain information, data, or records available to the public, the First Amendment limits how the state may restrict the subsequent use and sharing of that information. *Daily Mail*, 443 U.S. at 103 (invalidating West Virginia statute imposing criminal sanctions if juvenile offender's name was published without written court approval because if a party "lawfully obtains truthful information about a matter of public significance then state officials may not constitutionally punish publication of the information, absent a need to further a state interest of the highest order"); *Bartnicki*, 532 U.S. at 525 (reasoning that where party's "access to the information" was "obtained lawfully," the government could not restrict further publication); *The Fla.*

*Star*, 491 U.S. at 526, 538 (similar). And where states turn over information (*even if they are not required to do so*), they may not condition access to that information on recipients' agreement to forgo subsequent First Amendment rights to speak or use that information. *Cf. Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 208, 217 (2013) (holding that condition requiring organization to engage in certain speech violated the First Amendment). In other words, a state "may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech even if he has no entitlement to that benefit." *Id.* at 214 (quotation omitted); *see also Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017) ("[I]t is too late in the day to doubt that the liberties of religion and expression may be infringed by the denial of or placing of conditions upon a benefit or privilege." (quotation omitted)). A party does not need to prove a First Amendment right of access because a party does not need to show *any* right of access under any law to demonstrate a First Amendment violation. *See, e.g., Agency for Int'l Dev.*, 570 U.S. at 214.

Here, as in these cases, the Pennsylvania Ban "implicates the core purposes of the First Amendment because it imposes sanctions on the publication of truthful information of public concern." *Bartnicki*, 532 U.S. at 533-34.[3] And as the district

---

[3] In this way, the questions in this case mirror those in the First Amendment challenge to Daniel's Law before this Court, *Atlas Data Privacy Corp. v. We Inform,*

court noted, "access to the list comes with some limitations"—including the Internet Sharing Ban. **Appx5**. Pennsylvania's restriction on further publication of voter data is therefore undoubtedly a "condition" that "result[s] in an unconstitutional burden on First Amendment rights." *Agency for Int'l Dev.*, 570 U.S. at 214.

Moreover, even if VRF had to show a right of access (it does not), VRF did. As even the district court agreed, the NVRA supplies access rights. **Appx38-41** (noting parties "are entitled under the NVRA" to "access[] and publicly inspect[] the full voter data"). It *requires* the Commonwealth to produce the Voter List. 52 U.S.C. § 20507(i)(1). VRF was in no way bound to identify independent access rights under the First Amendment. The district court's contrary holding demands reversal.

## V.      VRF IS ENTITLED TO DECLARATORY AND INJUNCTIVE RELIEF.

Finally, this Court should grant VRF a declaratory judgment and permanent injunction. The district court only denied VRF declaratory relief because it granted summary judgment on the other claims. **Appx50-52**. (And the district court did not explicitly decide whether to grant the permanent injunction even though both parties briefed this issue. **Appx207-211, Appx677-678**.) Because the district court's holdings on the other claims are reversible errors, its failure to grant this relief is too.

---

*LLC*, No. 25-1555, 2025 WL 3058688 (3d Cir. Sept. 2, 2025), a case this Court has acknowledged implicates the First Amendment.

# CONCLUSION

For the foregoing reasons, the Court should reverse.


Dated: August 3, 2026

Respectfully submitted,

/s/ *Edward D. Greim*
Edward D. Greim, Mo. Bar #54034
Matthew R. Mueller, Mo. Bar #70263
Sarah R. Pineau, Mo. Bar #74483
Katherine E. Mitra, Mo. Bar #74671
**GRAVES GARRETT GREIM LLC**
1100 Main Street, Suite 2700
Kansas City, MO 64105
Telephone: (816) 256-3181
Fax: 816-256-5958
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com
spineau@gravesgarrett.com
kmitra@gravesgarrett.com
*Attorneys for Plaintiff-Appellant*

# CERTIFICATION OF ADMISSION TO BAR

I, Edward D. Greim, certify as follows:

1. I am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit.

2. Pursuant to 28 U.S.C. § 1746, I certify under penalty of perjury that the foregoing is true and correct.

/s/ Edward D. Greim
*Attorney for Plaintiff-Appellant*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE OF APPELLATE PROCEDURE 32(a) AND LOCAL RULE 31.1

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify the following:

This brief complies with the type-volume limitation of Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure because this brief contains 12985 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) of the Federal Rules of Appellate Procedure.

This brief complies with the typeface requirements of Rule 32(a)(5) of the Federal Rules of Appellate Procedure and the type style requirements of Rule 32(a)(6) of the Federal Rules of Appellate Procedure because this brief has been prepared in a proportionally spaced typeface using the 365 version of Microsoft Word in 14-point Times New Roman font.

This brief complies with the electronic filing requirements of Local Rule 31.1(c) because the text of this electronic brief is identical to the text of the paper copies, and the Vipre Virus Protection, version 3.1 has been run on the file containing the electronic version of this brief and no viruses have been detected.

Dated: August 3, 2026

/s/ Edward D. Greim
*Attorney for Plaintiff-Appellant*

# CERTIFICATE OF FILING AND SERVICE

I, Elissa Diaz, hereby certify pursuant to Fed. R. App. P. 25(d) that, on

August 3, 2026, the foregoing Brief and Appendix for Appellant Volume 1 was

filed through the CM/ECF system and served electronically.


/s/ Elissa Diaz

  Elissa Diaz

# APPENDIX 1

# TABLE OF CONTENTS

**Page**

**Volume I:**

Memorandum, filed April 23, 2026 ................................................................ Appx1

Order, filed April 23, 2026 ......................................................................... Appx53

Judgment, filed April 23, 2026 ................................................................... Appx55

Plaintiff's Notice of Appeal, filed May 22, 2026 ....................................... Appx56

**Volume II:**

Docket Entries ............................................................................................ Appx58

Complaint for Declaratory Judgment and Permanent Injunctive Relief,
   filed February 20, 2024 ....................................................................... Appx63

Excerpts of Defendant's Brief in Support of Motion to Dismiss, filed
   March 28, 2024 ................................................................................... Appx103

Exhibits to Plaintiff's Motion for Summary Judgment, dated
   December 6, 2024:

   Exhibit C: Declaration of Gina Swoboda ..................................... Appx113

   Exhibit D: Letter from DOS to VRF, dated November 16, 2023 ........... Appx118

   Exhibit E: Voter Data Request Form ............................................ Appx120

   Exhibit F: Full Voter Export Website Request Form ................... Appx123

   Exhibit G: Email from VRF to DOS, dated August 19, 2021 ................. Appx126

   Exhibit H: Letter from DOS to Truax, dated January 21, 2022 ............. Appx130

   Exhibit I: VRF March 7, 2022 Voter Data Request ..................... Appx132

i

Exhibit J: Defendant's Responses to VRF's Second Requests for Admission..................................................................... Appx144

Exhibit K: Denial Letter from DOS to VRF, dated April 13, 2022......... Appx156

Exhibit L: VRF November 2, 2023 Voter Data Request........................ Appx159

Exhibit M: VRF November 2, 2023 First NVRA Notice of Violation................................................................................... Appx162

Exhibit O: VRF November 17, 2023 Second NVRA Notice of Violation................................................................................... Appx166

Brief in Support of Plaintiff's Motion for Summary Judgment, filed December 6, 2024 ............................................................... Appx170

Exhibits to Defendant's Motion for Summary Judgment, dated December 6, 2024:

Exhibit A. Deposition of Jonathan Marks (Aug. 6, 2024)...................... Appx213

Exhibit B. Deposition of Gina Swoboda (Sept. 11, 2024)..................... Appx378

Exhibit C. Department of State Email to Counties (June 9, 2023).......... Appx501

Exhibit D. Request for Voter List from the Department of State............. Appx506

Exhibit E. Screenshot from voteref.com........................................... Appx509

Exhibit F. Email Exchange between Voter and VRF (May 26, 2022).... Appx512

Exhibit G. Email Exchange between Voter and VRF (May 26, 2022) ... Appx515

Exhibit H. Email Exchange between Voter and VRF (May 26, 2022) ... Appx518

Exhibit I. Email Exchange between Voter and VRF (May 26, 2022)..... Appx522

Exhibit J. Email Exchange between Voter and VRF (May 26, 2022)..... Appx526

Exhibit K. Compilation of Voter Complaints Made to the
   Department of State......................................................................... Appx548

Exhibit L. Email to Jonathan Marks (Oct. 13, 2021).............................. Appx588

Exhibit M. Letter from Timothy Gates to Doug Truax
   (Jan. 21, 2022) .............................................................................. Appx613

Exhibit T. Maintenance: Guidance under Section 8 of the National
   Voter Registration Act, 52 U.S.C. § 20507 (Sept. 2024)................. Appx615

Exhibit U. Response to RTKL Request No. 2022-052............................ Appx623

Exhibit V. Email Exchanges between Voters and VRF (Various
   Dates)........................................................................................... Appx626

Brief in Opposition to Plaintiff's Motion for Summary Judgment, filed
   January 10, 2025 ............................................................................ Appx633

Motion to Dismiss Pursuant to Rule 12(h) (3), dated March 23, 2026 ........... Appx682

Plaintiff's Response to Defendant's Motion to Dismiss, dated Mach 30,
   2026 .............................................................................................. Appx687

Exhibit R: Declaration of Joseph Benson, dated March 30, 2026........... Appx704

Exhibit S: Email, dated January 29, 2022............................................. Appx708

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| VOTER REFERENCE FOUNDATION, LLC, <br><br> Plaintiff, <br><br> v. <br><br> ALBERT SCHMIDT, in his official capacity as Secretary of the Commonwealth, <br><br> Defendant. | CIVIL ACTION NO. 1:24-CV-294 <br><br> (SAPORITO, J.) |

### MEMORANDUM

The Voter Reference Foundation, LLC ("VRF") is a non-profit organized under Ohio law.  (Doc. 42, ¶ 1). In this action before the Court, VRF requested voter data from the Secretary of the Commonwealth of Pennsylvania (the "Secretary") under the public disclosure provision of the National Voter Registration Act of 1993 ("NVRA"), 52 U.S.C. § 20507. The Secretary denied VRF's requests due to the plaintiff's failure to comply with the Commonwealth's requirement that voter data not be published on the Internet (the "Internet Sharing Ban"). VRF brings this action under the NVRA's private right of action to any person "aggrieved by a violation of the NVRA" on the basis that it was aggrieved by the

Appx1

Secretary's failure to provide it the requested voting data. VRF also argues that the Commonwealth's Internet Sharing Ban not only is preempted by the NVRA, but also violates the First Amendment of the United States Constitution. The Secretary contends that the Internet Sharing Ban is consistent with both. The parties have moved for summary judgment (Doc. 34; Doc. 37) and the matter has been fully briefed. (Doc. 35; Doc. 36; Doc. 38; Doc. 39; Doc. 44; Doc. 45; Doc. 46; Doc. 47).

## I.    Background

### A. Statutory Background

The National Voter Registration Act was enacted to "establish procedures that will increase the number of eligible citizens who register to vote in elections for Federal office," 52 U.S.C. § 20501(b)(1); "enhance [ ] the participation of eligible citizens as voters in elections for Federal office," § 20501(b)(2); "protect the integrity of the electoral process," § 20501(b)(3); and "ensure that accurate and current voter registration rolls are maintained." § 20501(b)(4). The NVRA requires states to follow certain procedures to facilitate voter registration, including establishing requirements for voter removal programs and prohibiting the removal of

- 2 -

Appx2

names from eligible voter lists unless specific conditions are met. § 20501(b); § 20501(3). Pertinent to this action, the NVRA prescribes certain state actions regarding the public disclosure of voter records and voter registration activities:

> (1) Each State shall maintain for at least 2 years and shall make available for public inspection and, where available, photocopying at a reasonable cost, all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2) The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

52 U.S.C. § 20507(i) (the "Public Disclosure Provision.").

To supplement the NVRA, Congress passed the Help America Vote Act ("HAVA"), requiring states to maintain "in a uniform and nondiscriminatory manner, a single, uniform, official, centralized, interactive computerized statewide voter registration list defined, maintained, and administered at the State level that contains the name

Appx3

and registration information of every legally registered voter in the State." 52 U.S.C. § 21083(a)(1)(A). HAVA requires a state's election system to "include provisions to ensure that voter registration records in the State are accurate and are updated regularly." 52 U.S.C. § 21083(a)(4). Pursuant to HAVA, Pennsylvania created the Statewide Uniform Registry of Electors system ("SURE"), a centralized voter registration database. 25 Pa. C.S.A § 1222(a). The SURE database, in simplest terms, is the official voter roll for Pennsylvania and is used to conduct voter list maintenance programs and activities for the Commonwealth. *See* 25 Pa. C.S.A § 1222. Pennsylvania uses the database to maintain accurate voter registration records through a range of programs and activities. *See, e.g.,* 25 Pa. C.S.A § 1203(h) (providing for county commissions' correction of voter data within the SURE registry and its own registration system); § 1501 (requiring county commissions to make and send "removal notices" to electors who are registered in the county); § 1508 (requiring the county commission to compare and correct the general and district registers of voters thirty days before each election).

As part of these programs and activities, Pennsylvania requires the

Appx4

maintenance of "public information lists," which provide the name, address, date of birth, and voting history of all individual registered electors. § 1404(a)(1). Individuals may inspect this list in one of two ways pursuant to § 1404. They may either request a printed record of the list or inspect a publicly available copy of the list. *Id.* But access to the list comes with some limitations. For example, "[n]o individual inspecting the list may tamper with or alter it," § 1404(a)(2), and "[a]n individual who inspects or acquires a copy of the public information list may not use any information contained in it for purposes unrelated to elections, political activities or law enforcement." § 1404(c)(2). Section 1404(b)(1) also allows the Secretary to promulgate additional "reasonable regulations governing access to the list." § 1404(b)(1). One such regulation, the Internet Sharing Ban, states: "The list may not be published on the Internet." 4 Pa. Code § 183.14(k). The Internet Sharing Ban lies at the center of the dispute between the parties.

The Internet Sharing Ban prohibits the publishing of the public information list regardless of how the information is obtained. Pertinent to this action, under § 1404(b)(1), Pennsylvania allows individuals to digitally request a version of the public information list called the "Full

Appx5

Voter Export" list ("FVE"). The FVE contains the following information concerning all voters in the Commonwealth: "voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and the date the voter's record was last changed." *See* PA Full Voter Export List, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/purchasepafullvoterexport.as px (last visited Apr. 23, 2026). The FVE is updated weekly and may be purchased for twenty dollars. But the data is subject to the Internet Sharing Ban, and purchasers must agree not to publish the list online. Individuals who do not agree to these terms will not be provided access to the FVE.

### B. Relevant Facts

On March 7, 2022, VRF sent a voter data request to the Department of State seeking a copy of the FVE. (Doc. 35, ¶ 117). The request specified that the information would not be used for commercial purposes, but solely for purposes permitted by law, including those related to elections,

Appx6

political activities, and law enforcement. (Doc. 35, ¶ 117, 118). VRF did not, however, agree to refrain from publishing the requested data online. (Doc. 35, ¶ 120). The Department denied VRF's request for that data, noting that the voting data is "only available upon completion of an affirmation that the information will only be used for purposes relating to elections, political activities, and law enforcement." (Doc. 35, ¶ 123). The Department also noted in its denial that "[i]n a previous request, [VRF] obtained access to the Full Voter Export list but violated the voter registration law and the Department's regulations by publishing the information obtained on the internet." (Doc. 35, ¶ 126).

On November 2, 2023, VRF sent a second voter data request to the Secretary, seeking a copy of the voter data. (Doc. 35, ¶ 128). VRF made the Secretary and the Department aware of its intention to use the data for two specific projects. (Doc. 35, ¶ 129). First, VRF informed the Secretary and the Department that it intended to "publish the requested information on its website for election related purposes, allowing citizens who agree to the terms of VRF's website to review the data and report any errors to the relevant election authority." (*Id.*) Second, VRF notified the Department that it intended to "analyze the records, information and

Appx7

data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls." (*Id.*). VRF again, however, failed to affirm that it would not publish the contents of the voter data online. (*Id.*).

On that same date, VRF sent the Secretary a Notice of Violation of the NVRA, claiming that the Secretary's denial of VRF's March 7, 2022, request for voter data violated the NVRA's public disclosure provision. (Doc. 35, ¶¶ 131, 132). VRF also notified the Department that it believed that the Commonwealth's Internet Sharing Ban was preempted by the NVRA's public disclosure provision. (Doc. 35, ¶ 133). Therefore, VRF requested that the Secretary correct its violation by making the requested information available to VRF. (Doc. 35, ¶ 134). It notified the Secretary that if voter information was withheld, it would seek legal recourse. (*Id.*).

On November 16, 2023, the Department responded to VRF's November 2, 2023, request for voter data and its Notice of Violation in a single letter. (Doc. 35, ¶ 135). The Department again denied VRF's request for voter data and articulated "that request is granted on the condition that VRF completes the affirmation required for obtaining this

Appx8

data pursuant to Pennsylvania law." (Doc. 35, ¶ 137). The Department further explained that VRF's March 7, 2022, request for voter data was "defective" because that data was requested under Pennsylvania's Right to Know Law rather than the NVRA. (Doc. 35, ¶ 136).

In response, on November 17, 2023, VRF sent the Secretary a second NVRA notice informing the Secretary that he had violated the NVRA by failing to produce the requested records. (Doc. 35, ¶ 139). VRF again notified the Secretary that the Internet Sharing Ban was preempted by the public disclosure provision of the NVRA. (Doc. 35, ¶ 140). The Secretary and VRF both concede that VRF's refusal to abide by the Internet Sharing Ban represented the sole reason for the denial of its voter data requests. (Doc. 35, ¶ 143).

On February 19, 2024, VRF initiated this action against Secretary Albert Schmidt. (Doc. 1). First, VRF argues that Pennsylvania's Internet Sharing Ban is preempted by the NVRA as the Ban prevents access to "records" which must be made available under the NVRA's public disclosure provision. (Doc. 1, ¶¶ 89–106). Second, VRF contends that the Secretary's denials of VRF's requests for voter data on March 7, 2022, and November 2, 2023, constitute violations of the NVRA's public

Appx9

disclosure provision. (*Id.*, ¶¶ 107–118). Third, VRF asserts that the Internet Sharing Ban is a violation of the First Amendment as the Ban "is a direct restriction on constitutionally protected, core political speech." (*Id.*, ¶¶ 119–138). Fourth, VRF maintains that the Internet Sharing Ban "is overbroad in that it regulates and prohibits more protected speech than is necessary to accomplish any legitimate government interests furthered by the restriction." (*Id.*, ¶¶ 139-147). Finally, VRF seeks a declaratory judgment asking the Court to hold that the Internet Sharing Ban violates the First Amendment while being unconstitutionally overbroad. Moreover, VRF requests the Court to permanently enjoin the defendants from enforcing the Internet Sharing Ban. (*Id.*, ¶¶ 148–153).

## II.    Legal Standard

Rule 56 of the Federal Rules of Civil Procedure dictates summary judgment should only be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" only if it might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is "genuine" only if the evidence "is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at

Appx10

248. In deciding a summary judgment motion, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Pastore v. Bell Tel. Co. of Pa.*, 24 F.3d 508, 512 (3d Cir. 1994).

Parties seeking summary judgment bear "the initial responsibility of informing the district court of the basis for its motion," and demonstrating the absence of a genuine dispute of material fact. *Celotext Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the movant makes such a showing, the non-movant must set forth specific facts, supported by the record, demonstrating that "the evidence presents a sufficient disagreement to require submission to the jury." *Anderson*, 477 U.S. at 251–52. A court must first determine if the moving party has made *prima facie* showing that it is entitled to summary judgment when evaluating such a motion. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331. Only once that *prima facie* showing has been made does the burden shift to the nonmoving party to demonstrate the existence of a genuine dispute of material fact. *See* Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 331.

Parties may cite to "particular parts of materials in the record,

- 11 -

Appx11

including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motion only), admissions, interrogatory answers or other materials." Fed. R. Civ. P. 56(c)(1)(A). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). "Although evidence may be considered in a form which is inadmissible at trial, the content of the evidence must be capable of admission at trial." *Bender v. Norfolk S. Corp.*, 994 F. Supp. 2d 593, 599 (M.D. Pa. 2014); *see also Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999) (noting that it is not proper, on summary judgment, to consider evidence that is not admissible at trial).

## III. Standing

### A. General Standing

"Under Article III of the Constitution, a federal court may exercise jurisdiction only where there is an actual case or controversy to be decided." *1st Westco Corp. v. Sch. Dist. of Philadelphia*, 6 F.3d 108, 112–13 (3d Cir. 1993) (citing *Golden v. Zwickler*, 394 U.S. 103, 108 (1969)); *see*

Appx12

*also* U.S. Const. Art. III, § 2, cl. 1. The "existence of a case and controversy is a prerequisite to all federal actions, including those for declaratory or injunctive relief." *Belitskus v. Pizzingrilli*, 343 F.3d 632, 639 (3d Cir. 2003). "The standing doctrine defines what is a 'case' or controversy.'" *Long v. Se. Pa. Transp. Auth.*, 903 F.3d 312, 320–21 (3d Cir. 2018).

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 180–81 (2000). A lack of standing is a defect of subject matter jurisdiction. *See McCray v. Fide. Nat'l Title Ins. Co.*, 682 F.3d 229, 243 (3d Cir. 2012) ("Absent Article III standing, a federal court does not have subject matter jurisdiction to address a plaintiff's claims, and they must be dismissed."). Standing is evaluated at the time of the filing of the complaint. *Laidlaw*, 528 U.S. at 190–91.

"[A] plaintiff must demonstrate standing for each claim he seeks to press." *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006). If a plaintiff fails to link his claims to the conduct of one defendant, then he

Appx13

lacks standing to sue that particular defendant because he has failed to allege the requisite traceability as to that defendant. *Easter v. Am. W. Fin.*, 381 F.3d 948, 961–62 (9th Cir. 2004) (concluding that plaintiffs who could not trace injury to a particular defendant lacked standing to sue that defendant); *accord Rabin v. NASDAQ OMX PHLX LLC*, 182 F. Supp. 3d 220, 230–31; *Polanco v. Omnicell, Inc.*, 988 F. Supp. 2d 451, 465 (D.N.J. 2013); *see also In re Takata Airbag Prods. Liab. Litig.*, 396 F. Supp. 3d 1101, 1126 (S.D. Fla. 2019) ("[S]tanding is defendant specific.") (citing *DaimlerChrysler*, 547 U.S. at 342).

Our standing analysis in this action is guided by the Supreme Court's decision in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021). In *TransUnion*, the Court reiterated that tangible harms, such as physical harms or monetary harms, readily qualify as concrete injuries under Article III. *TransUnion*, 594 U.S. at 425 ("If a defendant has caused physical or monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III."). The Court also noted that intangible harms can also qualify as concrete injuries under Article III. *Id.* (noting reputation harms, disclosure of private information, and those harms specified by the Constitution).

- 14 -

Appx14

Pertinent to this action, the Supreme Court specified that "[c]ourts must afford due respect to Congress's decision to impose a statutory prohibition or obligation on a defendant, and to grant a plaintiff a cause of action to sue over the defendant's violation of that statutory prohibition or obligation." *Id.* (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340–41 (2016)). The Court acknowledged that "Congress may 'elevate to the status of legally cognizable injuries concrete, *de facto* injuries that were previously inadequate in law.'" *Id.* at 426 (quoting *Spokeo*, 578 at 341). But the Court rejected that "a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.* (quoting *Spokeo*, 578 U.S. at 341). The Court emphasized that "Article III standing requires a *concrete injury* even in the contest of a statutory violation." *Id.* (quoting *Spokeo*, 578 U.S. at 341) (emphasis added).

In other words, the Court noted the difference between "(i) a plaintiff's statutory cause of action to sue a defendant over the defendant's violation of federal law, and (ii) a plaintiff's suffering concrete harm because of the defendant's violation of federal law." *Id.* at 426–27. Indeed, while:

- 15 -

> Congress may enact legal prohibition and obligations …
> [a]nd … create causes of action for plaintiffs to sue
> defendants who violate those legal prohibitions or
> obligations … [o]nly those plaintiffs who have been
> *concretely harmed* by a defendant's statutory violation
> may sue that private defendant over that violation in
> federal court.

*Id.* at 427. In this action, VRF's statutory cause of action to sue the
Secretary arises under the NVRA, which allows a private right of action
to any person "aggrieved" by a violation of the NVRA. (Doc. 1, ¶¶ 18, 19).
The central issue of standing before this Court is whether VRF's injury
pursuant to the NVRA is sufficiently concrete to constitute standing.

VRF brings this action based on the Secretary's failure to provide
voter data in response to VRF's requests. In short, VRF has alleged an
"informational injury." *See Kelly v. RealPage Inc.*, 47 F.4th 202, 211–12
(3rd Cir. 2022) ("[T]he Supreme Court has repeatedly recognized that an
'informational injury,' where a plaintiff alleges that she 'failed to receive
… information' to which she is legally entitled, is sufficiently concrete to
confer standing.") (citations omitted). The Third Circuit has held that an
informational injury constitutes standing when a party has showed: "(1)
the omission of information to which they claim entitlement, (2) 'adverse
effects' that flow from the omission, and (3) the requisite nexus to the

- 16 -

Appx16

'concrete interest' Congress intended to protect." *Kelly*, 47 F.4th at 214;

*Pub. Int. Legal Found. v. Sec'y Commonwealth of Pennsylvania*, 136 F.4th

456, 464 (3d Cir. 2025). Put differently, "a plaintiff seeking to assert an

informational injury must establish *a nexus* among the omitted

information to which she has entitlement, the purported harm *actually

caused* by the specific violation, and the *'concrete interest'* that Congress

identified as 'deserving of protection' when it created the disclosure

requirement." *Id.* at 213 (citing *Tailford v. Experian Info. Sols., Inc.*, 26

F.4th 1092, 1100 (9th Cir. 2022)) (emphasis added).

Here, it is undisputed that the Secretary denied VRF's request for

voter data on March 7, 2022, and November 16, 2023, and denied

information in which VRF's claims entitlement. But,

> [I]t is insufficient for Article III standing purposes for a
> plaintiff asserting an informational injury from a
> violation of a statute that contains a public disclosure
> aspect as part of its overall scheme to *allege only* that he
> has been denied information. Rather, he must *establish*
> a nexus among a downstream consequence, his alleged
> harm, and the interest Congress sought to protect.
> Without such a nexus, a plaintiff can claim no
> informational standing.

*Pub. Int. Legal Found.*, 136 F.4th at 465 (emphasis added). Upon review

of the record, VRF has failed to establish the necessary nexus between a

Appx17

harm and downstream consequence relating to an interest that Congress sought to protect.

### B.    Informational Standing in the Context of the NVRA — *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*

The Third Circuit recently decided an analogous case to this action concerning an "informational injury" under the NVRA in *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, 136 F.4th 456 (3d Cir. 2025). The plaintiff in the action, a self-described "public interest organization that seeks to promote the integrity of elections nationwide[,]" had requested records from the Secretary of the Commonwealth of Pennsylvania under the public inspection provision of the NVRA.[1] *Pub. Int. Legal Found.*, 136 F.4th at 459. The Secretary rejected the plaintiff's requests, and the plaintiff sued the Secretary on the basis that it had "suffer[ed] a clear *informational injury* as a direct result of the [Secretary's] violations of the NVRA because the [Secretary] denied [it] access to the records to which it [wa]s entitled under the law." *Id.* (emphasis included). The central issue before the Third Circuit was

---

[1] This public inspection provision is the same one at issue in the current action: 52 U.S.C. § 20507.

whether the plaintiff had suffered an informational injury sufficient to confer Article III standing.

Under the guidance of the three-pronged informational injury analysis seen in *Kelly* and articulated in *TransUnion*, the Third Circuit first analyzed the interest Congress sought to protect when enacting the NVRA. It observed that:

> Congress enacted the NVRA principally because it "was wary of the devastating impact [voter roll] purging efforts previously had on the electorate." *Am. C.R. Union v. Phila. City Comm'rs*, 872 F.3d 175, 178 (3d. Cir. 2017); *see also Welker v. Clarke*, 239 F.3d 596, 598–99 (3d Cir. 2001) (noting that "[o]ne of the NVRA's central purposes was to dramatically expand opportunities for voter registration"); *Ortiz v. Phila. Off. of City Comm'rs Voter Regis. Div.*, 28 F.3d 306, 318 (3d Cir. 1994) (Scirica, J., concurring) ("For some time now, Congress and the state legislatures, concerned by low voting rates, have commendably *sought to increase voter participation ....* [C]iting a steady decline of citizen participation in federal elections ... Congress decided to promote voter registration by passing the [NVRA]." (emphasis added)). Indeed, "Congress noted that ... 'there is a long history of such cleaning mechanisms [being] used to violate the basic rights of citizens" to vote. *Am. C.R. Union*, 872 F.3d at 178 (alteration in original) (quoting S. Rep. No. 103-6, at 18 (1993)).

*Pub. Int. Legal Found.*, 136 F.4th at 466–67. Moreover, while looking at the language of the statute, the Court recognized that the NVRA sought:

> (1) to establish procedures that will increase the number

- 19 -

of eligible citizens who register to vote in elections for Federal office;

(2) to make it possible for Federal, State, and local governments to implement this chapter in a manner that enhances the participation of eligible citizens as voters in elections for Federal office;

(3) to protect the integrity of the electoral process; and

(4) to ensure that accurate and current voter registration rolls are maintained.

*Id.* at 467 (quoting 52 U.S.C. § 20501(b)). The Court therefore concluded that "the statute aims at increasing citizen participation in federal elections." *Id.* In light of that analysis, the Court then considered the plaintiff's alleged harms and downstream consequences resulting from the Secretary's refusal to provide the required information.

The plaintiff argued that its inability to study and analyze the Secretary's voter data hampered its "activity ... to promote election integrity and compliance with federal and state statutes." *Id.* at 467. The Court held that this argument proved to be an insufficient nexus to the interest that Congress sought to prevent when passing the NVRA. Specifically, the Court explained that studying, analyzing, and scrutinizing records "is not an enumerated purpose of the NVRA ... [and] ... these aims [do not] advance the expansion of voter registration and

- 20 -

Appx20

participation in federal elections." *Id.* Moreover, the Court rejected the plaintiff's argument that "frustrat[ion] [of] the educational aspect of its mission," and the plaintiff's inability to publish "education materials" constituted downstream consequences sufficient to establish Article III standing. *Id.* at 468. The Court reasoned that "the facilitation and creation of educational materials is not a purpose of the NVRA" and "even if we assumed that the Secretary's actions actually hampered [the plaintiff's] ability to publish such materials, such harm has no 'nexus to the concrete interest Congress intended to protect' by requiring disclosure of the information." *Id.* (citations and quotations omitted). Finally, the Court noted that the plaintiff failed to submit "evidence of any specific plans for the records it sought relating to the purpose of the NVRA." *Id.* It held that "[w]ithout evidence that [the plaintiff] had 'concrete plans to imminently pursue a desired course of action' bearing a nexus to an interest Congress sought to protect that was hindered only by the Secretary's refusal to turn over the records, [the plaintiff] had no standing." *Id.* (citing *Ellison v. Am. Bd. of Orthopaedic Surgery*, F.4th 200, 207 n.5 (3d Cir. 2021)). The Court further explained that "'inchoate plans for future programs' of a general nature are insufficiently concrete

- 21 -

for Article III purposes," and therefore, "[a] general desire to audit a state's NVRA records without concrete plans to act upon information contained in the records in a manner consistent with the purpose of the statute does not establish standing...." *Id.* at 468–69 (quoting *Fair Hous. Concil of Suburban Phila. v. Montgomery Newspapers*, 141 F.3d 71, 77 (3d Cir. 1998)).

In sum, the Third Circuit concluded:

> [A]s an out-of-state "public interest organization," that has adduced insufficient evidence of a nexus among any adverse effect or downstream consequence and a harm it has suffered because of the Secretary's refusal to provide access to the requested records under *TransUnion* and its progeny, [the plaintiff] has no standing to sue. [The plaintiff] does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would "directly lead to action" or that *its* "direct participation in the electoral process [has been] hindered..." It has not suffered any concrete harm. And as the Supreme Court has proclaimed: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

*Id.* at 469 (citations and quotations omitted).

## C.   The Current Action

Like *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, VRF brings claims against the Secretary for an

informational injury under the NVRA, claiming that the Secretary violated the NVRA when he refused to make Pennsylvania voter data available to VRF. (Doc. 1, ¶ 3). We will employ the same analytical framework used by the Third Circuit. As noted above, a plaintiff seeking to assert an informational injury must establish *a nexus* among the omitted information to which she has entitlement, the purported harm *actually caused* by the specific violation, and the '*concrete interest*' that Congress identified as 'deserving of protection' when it created the disclosure requirement." *Kelly*, 47 F.4th at 213 (emphasis added). Therefore, VRF must establish a nexus between the denial of the available voter data, the purported harm actually caused by the denial, and the "aim[] at increasing citizen participation in federal elections." *Pub. Int. Legal Found.*, 136 F.4th at 467 (quoting 52 U.S.C. § 20501(b)). VRF has failed to do so here.

VRF has characterized its harm in various ways. In its complaint, VRF states that it "has, and intends to, post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA." (Doc. 1, ¶ 51). Moreover, it "desires to access, post, distribute, and otherwise use publicly available Pennsylvania voter

data on the Website in the future so that the public may become and remain informed...." (*Id.*, ¶ 53). In its statement of facts, VRF noted that:

> [It] intends to use the Voter List for two distinct projects. For its first project … VRF intends to publish the requested information on its website for election related purposes, allowing citizens who agree to the terms of VRF's website to review the data and report any errors to the relevant election authority... For its second project, VRF intends to analyze the records, information and data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls.

(Doc. 35, ¶ 129). In an opposition brief, VRF writes about "its belief that sharing the requested information would foster confidence in the integrity of the electoral system, thereby encouraging voter participation." (Doc. 53, ¶ 1) (citing Doc. 1, ¶¶ 8, 42). But, however VRF chooses to characterize its harm, it is clear that its allegations fall into those types of harm deemed by the Third Circuit to have an insufficient nexus to the purposes of the NVRA.

First, VRF states that the denial impeded on its plans "to analyze the records, information and data provided in response to the above request in order to engage in a discrepancy review of the Pennsylvania voter rolls." (Doc. 35, ¶ 129). Nonetheless, the Third Circuit has deemed this argument unavailing, explaining that studying, analyzing, and

- 24 -

Appx24

scrutinizing records "is not an enumerated purpose of the NVRA … [and] … these aims [do not] advance the expansion of voter registration and participation in federal elections." *Pub. Int. Legal Found.*, 136 F.4th at 467. Second, VRF contends that the denial frustrated its intention to "post this data for the public to access and view free of charge so that the public can fulfill its oversight duties under the NVRA" (Doc. 1, ¶ 51), and the denial further frustrated VRF's "desire[] to access, post, distribute, and otherwise use publicly available Pennsylvania voter data on the Website in the future so that the public may become and remain informed…." (*Id.*, ¶ 53). But again, the Third Circuit has rejected the argument that the "frustrat[ion] [of] the educational aspect of [a] mission" and the inability to publish "educational materials" constitutes downstream consequences envisioned by the NVRA to establish Article III standing. *Pub. Int. Legal Found.*, 136 F.4th at 467. It held that "the facilitation and creation of educational materials is not a purpose of the NVRA" and "bears no nexus to an interest protected by the statute." *Id.* Finally, VRF appears to argue that the Secretary's denial of voter data somehow hinders confidence in the integrity of the electoral system. (Doc. 53, ¶ 1). However, cognizable injures must be "concrete and

- 25 -

Appx25

particularized" and not "speculative." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Here, the detriment of the integrity of the electoral system is neither concrete nor particularized. Indeed, it is wholly speculative.

In sum, to the extent that VRF alleges an informational injury under the NVRA for the Secretary's failure to make requested records available for inspection, our holding mirrors that of the Third Circuit in *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*:

> [The plaintiff] does not represent any Pennsylvania citizens who have been affected by the Secretary's purported violation of the NVRA. It has no direct ties to Pennsylvania voters and has not alleged how access to the records it seeks would "directly lead to action" or that *its* "direct participation in the electoral process [has been] hindered… It has not suffered any concrete harm. And as the Supreme Court has proclaimed: "No concrete harm, no standing." *TransUnion*, 594 U.S. at 417.

*Pub. Int. Legal Found.*, 136 F.4th at 469 (emphasis in original). Therefore, we find that VRF has failed to allege Article III standing based on the informational injuries asserted in Counts II and III of its complaint for the Secretary's failure to make the voter data available for inspection in violation of the public disclosure provision under 52 U.S.C.

Appx26

§ 20507.

But, contrary to *Public Interest Legal Foundation v. Secretary Commonwealth of Pennsylvania*, our analysis of standing does not end at the allegations of an informational injury. VRF argues that it has standing for its remaining claims because it suffered "reasonable apprehension that it faced criminal or civil enforcement if it followed through with its plans" to publish the voter data that it acquired from a third-party. (Doc. 53, at 7). It bases this assertion on a takedown letter it received from chief counsel at Pennsylvania's Department of State, demanding that VRF "take immediate action to remove all Pennsylvania-voter information … and any other related websites under their custody or control." (Doc. 19-1). Unlike with VRF's informational standing claim, we find this action sufficient to constitute standing for purposes of VRF's remaining claims.

As we noted above, to establish the existence of standing, a plaintiff must demonstrate that:

> [T]o satisfy Article III's standing requirements, a plaintiff must show (1) it has suffered an "injury in fact" that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely

Appx27

speculative, that the injury will be redressed by a favorable decision.

*Friends of the Earth, Inc*, 528 U.S. at 180–81. However, "in a case involving a pre-enforcement facial challenge to a statute alleged to be in violation if the First Amendment, 'even the remotest threat of prosecution, such as the absence of a promise not to prosecute,' can satisfy the injury-in-fact requirement." *Project Vote v. Kelly*, 805 F. Supp. 2d 152, 165 (W.D. Pa. 2011) (quoting *Peachlum v. City of York, Pennsylvania*, 333 F.3d 429, 435 (3d Cir. 2003)); *see also Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) ("[W]e have held that a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'") (quoting *Babbitt v. Farm Workers Nat. Union*, 442 U.S. 289, 298 (1979)). "Where a statutory prohibition implicates First Amendment rights, there is a danger that the statute's 'very existence' will cause individuals to refrain from engaging in constitutionally-protected activities rather than run the risk of being prosecuted." *Id.* (citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973)). "The Supreme Court has described this danger of 'self-censorship' as 'a harm that can

Appx28

be realized even without an actual prosecution.'" (*Id.*, at 165–66) (quoting *Virginia v. American Booksellers Association, Inc.*, 484 U.S. 383, 393 (1988)). We find that the Department of State's takedown letter satisfies the injury-in-fact requirement.

Pennsylvania statute §1707(a)(4) prohibits any person from "[a]cess[ing] … official documents or records … with the intent to publicize or otherwise unlawfully misuse the equipment or information contained therein." 25 Pa. C.S.A. § 1707(a)(4). It further articulates that "any person who violates subsection (a) commits a misdemeanor of the first degree and shall, upon conviction, be sentenced to pay a fine of not more than $6,000 or to imprisonment for not more than three years, or both." 25 Pa. C.S.A. § 1707(b). When VRF accessed the full voter export list and published that data on the internet, it faced monetary fines or imprisonment under the confines of § 1707(a)(4). Therefore, we find that the Department of State's takedown letter satisfies the injury-in-fact requirement concerning VRF's remaining claims: (1) Internet Sharing Ban: Preemption by the National Voter Registration Act (Count I); (2) Internet Sharing Ban: First Amendment—Ban on Core Political Speech (Count VI); and (3) Internet Sharing Ban: First Amendment-

Appx29

Overbreadth (Count V).

## IV.   NVRA Preemption Claim

We turn to VRF's argument in Count I of its complaint that the Commonwealth's Internet Sharing Ban is preempted by the NVRA, specifically under its public disclosure provision. As we noted above, the public disclosure provision is as follows:

> (1)  Each State shall maintain for at least 2 years and shall *make available for public inspection* and, where available, photocopying at a reasonable cost, *all records concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters*, except to the extent that such records relate to a declination to register to vote or to the identity of a voter registration agency through which any particular voter is registered.

> (2)  The records maintained pursuant to paragraph (1) shall include lists of the names and addresses of all persons to whom notices described in subsection (d)(2) are sent, and information concerning whether or not each such person has responded to the notice as of the date that inspection of the records is made.

§ 20507(i) (emphases added). Before we address VRF's preemption argument, however, we must first determine whether the full voter export list falls under the purview of the NVRA's public disclosure provision. Put differently, we face the question of whether the full voter

- 30 -

Appx30

export list constitutes a record "concerning the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." *Id.* Unsurprisingly, VRF and the Secretary share two different perspectives on this issue. VRF asserts that the SURE database, and the full voter export list contained within it, are "records" subject to public inspection under the NVRA. (Doc. 36, at 14). The Secretary contends that the full voter export list is not a record within the scope of the NVRA's disclosure provision. (Doc. 39, at 25).

The NVRA requires states to disclose "all records" related to efforts by the state to ensure "the accuracy and currency" of voter registration lists. The Secretary uses the SURE database to accomplish its goals in maintaining the accuracy and currency of lists through a variety of means. *See* (Doc. 35, ¶¶ 26–54) (admitting to using the database to, among other activities, documenting voter history, updating voter information, identifying duplicate registration, and tracking changes made to a voter's registration status or profile). These actions help Pennsylvania maintain accurate and current official lists of eligible voters as citizens register to vote, relocate, or otherwise update their

personal information. The Commonwealth does so with the help of the information contained in the full voter export list. Therefore, the Commonwealth's use of the voting data to ensure the accuracy and currency of its voter registration lists brings it within the universe of disclosable records under the NVRA.

But the full voter export list also constitutes a "record" under its plain and ordinary meaning in the context of the NVRA. *See Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'") (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)). For starters, the Commonwealth placed the requirements for the public information lists under a chapter explicitly labeled "Records." *See* 25 Pa.C.S. § 1404; *See also Almendarez-Torres v. United States*, 523 U.S. 224, 234 (1998) ("We also note that 'the title of a statute and the heading of a section' are 'tools available for the resolution of a doubt' about the meaning of a statute.") (quoting *Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528–29 (1947)). Moreover, in *Voter Reference Foundation LLC v. Torrez*, 160 F.4th 1068, 1089 (10th Cir. 2025), the Tenth Circuit analyzed and

- 32 -

Appx32

interpreted the ordinary meaning of the term "record" at the time Congress enacted the NVRA. It found that:

> [A] "record" is "knowledge or information preserved or handed down" "by being put into writing." *Records*, Oxford English Dictionary (2d ed. 1989). And "writing" is defined as "[t]hat which is in a written (now also typewritten) state or form" or "something penned or recorded." *Writing*, Oxford English Dictionary (2d ed. 1989). Significantly, as far back as 1946, "writing" was understood to include recording information on a computer storage medium. *Id.* ("To enter (an item of data) *in*, *into*, *on*, or *to* a storage medium" such as "computers"). Thus, we interpret "records" to mean knowledge or information that is preserved by being put into written form—whether penned or not.

*Voter Reference Found., LLC*, 160 F.4th at 1085 (emphasis included). We agree with the Tenth Circuit that online or computer records constitute "records" under the NVRA. *Id.* Here, the full voter export list contains the following fields: voter ID number, name, sex, date of birth, date registered, status (i.e., active or inactive), date status last changed, party, residential address, mailing address, polling place, date last voted, all districts in which the voter votes (i.e., congressional, legislative, school district, etc.), voter history, and date the voter's record was last change. (Doc. 35, ¶ 15). Thus, the full voter export list contains voter information that is put into writing and recorded in the SURE database, a computer

storage medium. It therefore is encompassed under the definition of a "record." Moreover, we find that the full voter export lists concerns "the implementation of programs and activities conducted for the purpose of ensuring the accuracy and currency of official lists of eligible voters." 52 U.S.C. § 20507(i). The NVRA seeks "to ensure that accurate and current voter registration rolls are maintained." *Id.*, § 20501(b). Accordingly, the Commonwealth of Pennsylvania determines whether voter information is accurate and current by providing the public with the opportunity to inspect the information contained in the full voter export list.

For these reasons, we find that the full export voter list is a "record" ensuring the accuracy and currency of information pertaining to eligible voters. It therefore falls under the scope of the public disclosure provision of the NVRA. We also note that, while persuasive but not dispositive, many courts have found that voting data serves as a "record" under the NVRA. *See Pub. Int. Legal Found. Inc.*, v. *Bellows*, 92 F.4th 36, 49 (1st Cir. 2024) (finding that Maine's voter file is a "record" subject to the public disclosure provision); *Voter Reference Found., LLC v. Torrez*, 160 F.4th 1068, 1089 (10th Cir. 2025) (affirming that state voter data is a "record" under the NVRA); *Pub. Int. Legal Found., Inc. v. Matthews*, 589 F. Supp.

Appx34

3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration*, No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (finding that statewide voter registration list is a "record" under the NVRA); *Pub. Int. Legal Found., Inc. v. Knapp*, 749 F. Supp. 3d 563, 569 (D.S.C. 2024) (concluding that voter data are "records" under the NVRA); *Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 446 (D. Md. 2019) (finding that a voter registration list including "name, home address, most recent voter activity, and active or inactive status" were "records" under the NVRA). Having concluded that the full voter export list is subject to the NVRA's public disclosure provision, we must decide whether the Internet Sharing Ban is preempted by that provision.

Preemption is based on the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, which invalidates state law that "interferes with or is contrary to federal law." *Free v. Bland*, 369 U.S. 663, 666 (1962) (citations omitted). "Federal law can preempt state law in three ways: (1) express preemption, (2) field preemption, and (3) conflict preemption." *Farina v. Nokia Inc.*, 625 F.3d 97, 115 (3d Cir. 2010) (citing *Hillsborough Cnty. Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985)).

Appx35

> Express preemption applies where Congress, through a statute's express language, declares its intent to displace state law. Field preemption applies where "the federal interest is so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject. Conflict preemption nullifies state law inasmuch as it conflicts with federal law, either where compliance with both laws is impossible or where state law erects an "obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Id.* (internal citations omitted). VRF argues that the Internet Sharing Ban is preempted under the theory of conflict prevention (hereinafter "obstacle preemption").[2] (Doc. 36, at 18).

The Secretary argues that the NVRA cannot preempt the Internet Sharing Ban because obstacle preemption does not apply to provisions under the Elections Clause, such as the public disclosure provision. (Doc. 44, at 22). But as VRF points out, many federal courts have applied obstacle preemption in NVRA cases concerning the public disclosure provision under the Elections Clause. *See Bellows*, 92 F.4th at 54; *Torrez*, 160 F.4th at 1084; *Knapp*, 2024 WL 4792051, at *7; *Lamone*, 399 F. Supp.

---

[2] "Conflict preemption" and "obstacle preemption" are interchangeable terms. Here, VRF and the Secretary both use "obstacle preemption" in their briefs. Therefore, we have chosen to use that term as well.

Appx36

3d at 445; *Matthews*, 589 F. Supp. 3d at 943. Generally, courts presume that Congress did not intend to preempt state law absent a clear and manifest purpose to do so. *Gregory v. Ashcroft*, 501 U.S. 452, 460–61 (1991); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). But that presumption does not apply to legislation pertaining to the Elections Clause, such as the NVRA, *see Arizona v. Inter Tribal Council of Arizona Inc.*, 570 U.S. 1, 13 (2013), because the text of the Elections Clause states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress *may at any time by Law make or alter such Regulations,* except as to the Places of chusing Senators." U.S. Const. Art. 1, § 4, cl. 1 (emphasis added). In other words, because the Elections Clause "empowers Congress to 'make or alter' state election regulations[,]" "[the] assumption that Congress is reluctant to pre-empt does not hold when Congress acts" under the Clause. *Inter Tribal*, 570 U.S. at 14. "[T]he reasonable assumption is that the statutory text accurately communicates the scope of Congress's pre-emptive intent." *Id.* Therefore, without a presumption against preemption in the Elections Clause and in NVRA jurisprudence, we must examine the text of the

- 37 -

Appx37

NVRA and the text of the Internet Sharing Ban to determine whether the Ban presents an obstacle to the accomplishment, execution, and intent of the NVRA.

The public disclosure provision of the NVRA requires the public release of the voter export file by ordering "all records concerning the implementation of" Pennsylvania's voter list registration and maintenance activities to be "ma[d]e available for *public inspection*." 52 U.S.C. § 20507(i)(1) (emphasis added). As we did when analyzing the meaning of "record" in the context of the NVRA, we must therefore determine the ordinary meaning of the words "public inspection," keeping in mind the "fundamental canon of statutory construction" that words take "their ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019). In *Greater Birmingham Ministries v. Sec'y of State for Alabama*, 105 F.4th 1324 (11th Cir. 2024), the Eleventh Circuit analyzed and interpreted the ordinary meaning of the words "public inspection" at the time Congress enacted the NVRA. It determined that "[t]o 'inspect' is to 'look carefully' or to 'view closely and critically.'" *Id.* at 1332 (citing *Inspect*, Oxford English Dictionary (2d ed. 1989)). "To make something available for

- 38 -

Appx38

public inspection, then, is to make it available in public, or to the public, for close scrutiny." *Id.* We agree that the Eleventh Circuit's interpretation of "public inspection" accurately reflects its ordinary meaning. Therefore, we must determine whether the Commonwealth adequately provides the full voter export file in a manner that allows for meaningful public scrutiny, and whether the Internet Sharing Ban impedes the public's ability to access and examine that data.

We conclude that the Commonwealth's process for requesting the voter data affords such scrutiny and that the Internet Sharing Ban does not meaningfully obstruct it. As we noted above, Pennsylvania allows any individual to request the full voter export list online for viewing provided that the individual purchases that data for twenty dollars. *See* PA Full Voter Export List, Pennsylvania Department of State, https://www.pavoterservices.pa.gov/pages/purchasepafullvoterexport.aspx (last visited Apr. 23, 2026). Individuals may then "look carefully" or "view closely and critically" the entirety of the weekly-updated list to "ensure that accurate and current voter registration rolls are maintained," as required by the NVRA. § 20501(b)(4). Those individuals may then reach out to the Commonwealth to rectify any errors in that

- 39 -

Appx39

voting data. Therefore, the Commonwealth follows the guidelines of the Public Disclosure Provision of the NVRA. 52 U.S.C. § 20507(i)

We find that the Internet Sharing Ban does not present an obstacle to the NVRA's purposes and goals. The Internet Sharing Ban does not restrict any party's access to data to which they are entitled. *See Project Vote/Voting for AM., Inc. v. Long*, 813 F. Supp. 2d 738, 743 (E.D. Va. 2011), *aff'd and remanded*, 682 F.3d 331 (4th Cir. 2012) (finding the NVRA preempted a Virginia statute foreclosing disclosure of certain records required under the NVRA). It does not selectively limit parties' access to voter data to which they are entitled. *See Jud. Watch, Inc. v. Lamone*, 399 F. Supp. 3d 425, 445 (D. Md. 2019) (finding that the NVRA preempted a Maryland election law provision only allowing Maryland registered voters to access voter registration lists). It does not redact voter data to which parties are entitled. *See Voter Reference Foundation, LLC v. Galvin,* No. 24-CV-12592-DJC, 2026 WL 836855, at *8 (D. Mass. Mar. 26, 2026) (finding that the NVRA preempted a Massachusetts statute that redacted information required to be disclosed under the NVRA). Moreover, it does not constrain a party's ability to conduct a thorough inspection of the data. *See Pub. Int. Legal Found., Inc. v. Matthews*, 589

Appx40

F. Supp. 3d 932, 942 (C.D. Ill. 2022), *clarified on denial of reconsideration,* No. 20-CV-3190, 2022 WL 1174099 (C.D. Ill. Apr. 20, 2022) (finding that the NVRA preempted an Illinois statute that prevented parties from viewing a voter registration list in full). Indeed, the Internet Sharing Ban does not in any way prevent any party from accessing and publicly inspecting the full voter data to which they are entitled under the NVRA; it only prevents the full voter export list from being published on the Internet. Therefore, we are unpersuaded that the Ban presents an obstacle to the purposes and goals of the NVRA's public disclosure provision. Accordingly, we conclude that the NVRA does not preempt the Internet Sharing Ban, 4 Pa. Code § 183.14(k).

As VRF points out, however, our finding runs counter to those holdings of the First and Tenth Circuits, where they concluded that similar state prohibitions preventing voter data from being published on the internet were preempted by the NVRA. In *Public Interest Legal Foundation, Inc. v. Bellows*, 92 F.4th 36 (1st Cir. 2024), the First Circuit held that a Maine statute prohibiting the publication of voter registration

information on the Internet (the "Publication Ban")[3] was preempted by the NVRA. The Court explained that the public disclosure provision of the NVRA provision "evinces Congress's belief that public inspection, and thus *public release, of Voter File data* is necessary to accomplish the objectives behind the NVRA. Indeed, the analysis and subsequent *dissemination of Voter File data* to the public is necessary if members of the public, or organizations … are ever to identify, address, and fix irregularities in states' voter rolls." *Bellows*, 92 F.4th at 54 (emphasis added). Similarly, in *Voter Reference Foundation, LLC v. Torrez*, 160 F.4th 1068 (10th Cir. 2025), the Tenth Circuit held that a New Mexico statute prohibiting voter data to be made publicly available on the internet (the "Data Sharing Ban")[4] was preempted by the NVRA. The

---

[3] The Publication Ban provided that a person obtaining voter data may not:

> Cause the voter information or any party of the voter information that identifies, or that could be used with other information to identify, a specific voter, including but not limited to a voter's name, residence address or street address, to be made accessible by the general public on the Internet or through other means.

Me. Rev. Stat. Ann. Tit. 21-A, § 196-A(1)(J)(2).

[4] The Data Sharing Ban detailed that the unlawful use of voter data

*(continued on next page)*

- 42 -

Appx42

Tenth Circuit explained that the NVRA "encourages broad and extensive public disclosure of relevant records without restrictions on who provides it. That makes sense because the consequent goal in *widely circulating the voter data* is that any inaccuracies can be identified and corrected." *Torrez*, 160 F.4th at 1083 (emphasis added). Therefore, the First and Tenth Circuits concluded that NVRA's purpose through public inspection was not limited strictly to the availability of voting data, but rather also to the dissemination of that data, concluding that the data's release and circulation prove critical to the goals of the NVRA. But we do not read the NVRA's plain text as broadly as those Circuits, and thus, we disagree with their interpretation of the statute. The NVRA only requires the availability of the voting data for public inspection; it does not require its

---

or special voter lists consists of:

> (2) causing voter data, mailing labels or special voter lists or any part of the voter data, mailing label or special voter lists that identifies, or that could be used to identify, a specific voter or the voter's name, mailing or residence address to be made publicly available on the internet or through other means.

N.M. Stat. Ann. § 1-4-5.6(A)(2).

Appx43

dissemination through public release or circulation.

Courts "cannot change the requirements of a statute just because doing so seems consistent with its goals." *Greater Birmingham Ministries*, 105 F.4th at 1334. "[P]urpose cannot be used to contradict text or to supplement it." *Id.* (quoting *Bellitto v. Snipes*, 935 F.3d 1192, 1201 (11th Cir. 2019)) (alteration adopted) (quotation omitted). Indeed, "the NVRA is particularly ill-suited to focus on purpose rather than text because the statute's purposes are multiple and in tension with each other." *Id.* (quoting *Bellitto*, 935 F.3d at 1201). When analyzing its text, the NVRA's public disclosure provision does not require broad dissemination of the voting data; it only speaks of "public inspection" and "where available, photocopying." 52 U.S.C. § 20507(i)(1). "The exigencies of one case, however compelling, cannot expand unambiguous text beyond its plain command." *Greater Birmingham Ministries*, 105 F.4th at 1334. "The statute says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 583 U.S. 416, 426 (2018). And here, the unambiguous text of the NVRA only requires the Commonwealth of Pennsylvania to make the voting data available so that the public may inspect it; it does not speak the

- 44 -

requirements of its public release or public circulation.[5] Therefore, we respectfully disagree with the opinions of the First Circuit and the Tenth Circuit that the NVRA's purposes include the dissemination of the voter data, rather than just its availability to the public, as their interpretation expands the requirements of the statute beyond just its plain statutory text. As the Eleventh Circuit succinctly held, "[n]o amount of purpose-driven inference can expand the meaning of a statute, and we cannot step in to help." *Greater Birmingham Ministries*, 105 F.4th at 1333.

## V.    First Amendment Claims

Finding that the NVRA does not preempt the Internet Sharing Ban, we move to VRF's contention that the Internet Sharing Ban violates the First Amendment of the United States Constitution because it constitutes a ban on core political speech. The First Amendment states:

---

[5] The Eleventh Circuit also noted that when the NVRA was passed in 1993, the meaning of the phrase "public inspection" in the Freedom of Information Act's ("FOIA") nearly identically worded provision was widely understood to require "only availability, not delivery." *Greater Birmingham Ministries*, 105 F.4th at 1333 (quoting *Mandel Grunfeld & Herrick v. U.S. Customs Serv.*, 709 F.2d 41, 42 (11th Cir. 1983)). Further, while Congress amended FOIA three years later to include disclosure measures, it consciously chose not to update the same language in the NVRA's public disclosure provision despite having the opportunity to do so. *Id.*

- 45 -

Appx45

"Congress shall make no law … abridging the freedom of speech, or of the press." U.S. Const. amend. I. It secures the "freedom of expression upon public questions." *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002). But "this principle, like other First Amendment principles, is not absolute." *Id.* (quoting *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65 (1983)); *see also Dennis v. United States*, 341 U.S. 494, 503 (1951) (noting that the First Amendment does not protect an "unlimited, unqualified right," because the "societal value of speech must, on occasion, be subordinated to other value and considerations."). For example, the First Amendment only regulates "government regulation of private speech," not government speech or private speech regulations. *Pleasant Grover City, Utah v. Summum*, 555 U.S. 460, 467 (2009). But pertinent to this action, the Supreme Court has held that the First Amendment does not "mandate[] a right of access to government information or sources of information within the government's control." *Houchins v. KQED*, 438 U.S. 1, 15 (1978) (plurality opinion); *id.*, at 16

Appx46

(Stewart, J., concurring) (stating that the First Amendment "do[es] not guarantee the public a right of access to information generated or controlled by the government"); *see Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 182 (3d Cir. 1999).

Here, we find that VRF is seeking voting data information within the Commonwealth's control, and therefore we conclude that the Commonwealth's decision to limit access to that information is entitled to "deference as a policy matter." *Voter Reference Found., LLC v. Torrez*, 727 F. Supp. 3d 1014, 1225 (D.N.M. 2024), *aff'd*, 160 F.4th 1068 (10th Cir. 2025) (finding that New Mexico's decision to "allow access in its control is entitled to 'deference as a policy matter.'") (citation omitted); *see Fusaro v. Cogan*, 930 F.3d 241, 256 (4th Cir. 2019) ("[W]e emphasize that the gravamen of [the plaintiff's] claims remains a request for government information. Thus … the initial decision to release such information remains, fundamentally, a policy choice. And the judgment of the Maryland legislature regarding the release of government information is entitled to substantial deference…."). The Commonwealth's restrictions are "best conceptualized as restrictions on access to information within government control and not as restrictions on speech." *Torrez*, 727 F.

Supp. 3d at 1225; *see McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 344–46 (1995) (distinguishing between "a regulation of pure speech," and election-related restrictions that are one step removed from pure speech); *Los Angeles Police Dep't v. United Reporting Pub. Corp.*, 528 U.S. 32, 42 (1999) ("I join the Court's opinion, which recognizes that [the statute] is properly analyzed as a restriction on access to government information, not as a restriction on protected speech."); *Travis v. Reno*, 163 F. 3d 1000, 1007 (7th Cir. 1998) ("Peering into public records is not part of the 'freedom of speech' that the first amendment protects."). Therefore, we find that VRF's contention that the Internet Sharing Ban constitutes a direct restriction on core political speech to be meritless, as the Internet Sharing Ban does not offend the First Amendment. *See Mouzone v. Cmty. Improvement, Agency*, No. 24-2679, 2025 WL 740832, at *1 (3d Cir. Feb. 20, 2025) ("[The plaintiff's] First Amendment claims fail because he has failed to show a constitutional right of access to information generated or controlled by the government.").

VRF also contends that the Internet Sharing Ban violates the First Amendment of the United States Constitution because it is overbroad "in that it regulates and prohibits substantially more protected speech than

- 48 -

Appx48

is necessary to accomplish any legitimate government interests furthered by the restriction." (Doc. 1, ¶ 140). A law may be invalidated facially as "overbroad" if "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 427 (3d Cir. 2020) (quoting *United States v. Stevens*, 559 U.S. 460, 473 (2010)) (quotation marks omitted). An "overbreadth claimant bears the burden of demonstrating, from the text of the law and from actual fact, that substantial overbreadth exists." *Id.* (quoting *Virginia v. Hicks*, 539 U.S. 113, 122 (2003)) (alterations and quotation marks omitted). The Supreme Court has "vigorously enforced the requirement that a statute's overbreadth be substantial." *Stevens*, 559 U.S. at 485 (emphasis omitted). "The hesitation to label a statute overbroad arises from a court's need to strike a balance between competing social costs[.]" *Turco v. City of Englewood, New Jersey*, 935 F.3d 155, 171 (3d Cir. 2019).

> On the one hand, the threat of enforcement of an overbroad law deters people from engaging in constitutionally protected speech, inhibiting the free exchange of ideas. On the other hand, invalidating a law that in some of its application is perfectly constitutional ... has obviously harmful effects.

*McCauley v. Univ. of the Virgin Islands*, 618 F.3d 232, 241 (3d Cir. 2010)

- 49 -

Appx49

(quoting *United States v. Williams*, 553 U.S. 285, 292 (2008)) (emphasis in original).

However, we need not undergo an analysis to determine whether the Internet Sharing Ban is "overbroad." As we held above, the Internet Sharing Ban does not implicate the protections of the First Amendment, and thus, does not regulate protected speech. Accordingly, because the Internet Sharing Ban does not fall under the purview of the First Amendment, it cannot be said its requirements are substantially overbroad in violation of that Amendment. Therefore, we find VRF's First Amendment claims to be meritless.

## VI.   Declaratory Judgment

The federal Declaratory Judgment Act, 28 U.S.C. § 2201, provides that "[i]n a case of actual controversy within its jurisdiction .. any court of the United States … may declare the rights and other legal relations of any interested party seeking such declaration, whether further relief is or could be sought." 28 U.S.C. § 2201(a). "District courts possess discretion in determining whether and when to entertain an action under the Declaratory Judgment Act, even when the suit otherwise satisfies subject matter jurisdictional prerequisites." *Wilton v. Seven Falls Co.*,

Appx50

515 U.S. 277, 282 (1995). Moreover, the Act is "an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant." *Id.* at 287 (internal quotations and citations omitted).

Courts within the Third Circuit have consistently found that the party seeking declaratory judgment has the burden of establishing the existence of an actual case or controversy. *Team Angry Filmworks, Inc. v. Geer*, 214 F. Supp. 3d 432, 441 (W.D. Pa. 2016); *Dodge-Regupol, Inc. v. RB Rubber Prod., Inc.*, 585 F. Supp. 2d 645, 650 (M.D. Pa. 2008) ("[A] party seeking to base jurisdiction on the Declaratory Judgment Act bears the burden of proving that the facts alleged, 'under all the circumstances, show that there is a substantial controversy, between the parties having adverse legal interest, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.'") (quoting *Benitec Australia, Ltd. v. Nucleonics, Inc.*, 495 F.3d 1340, 1343 (Fed. Cir. 2007)). VRF has based its request for a declaratory judgment on the same claims that we have granted summary judgment against in the underlying action. Therefore, as we found there were no genuine issues of material fact precluding us from granting summary judgment on VRF's claims, we will grant summary judgment as to this claim because VRF no longer pleads claims

Appx51

with an existing actual case or controversy. *See Brugler v. Unum Grp.*, No. 4:15-CV-01031, 2018 WL 5734680, at *4 (M.D. Pa. Nov. 2, 2018) (granting summary judgment on the plaintiff's request for a declaratory judgment due to the absence of genuine issues of material fact concerning the declaratory judgment).

## VII.  Conclusion

For the foregoing reasons, we will grant the Secretary's motion for summary judgment in its entirety, and we will deny VRF's motion for summary judgment in its entirety.

An appropriate order follows.

Dated: April 23, 2026              *s/Joseph F. Saporito, Jr.*
                                   JOSEPH F. SAPORITO, JR.
                                   United States District Judge

Appx52

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF PENNSYLVANIA

VOTER REFERENCE
FOUNDATION, LLC,

      Plaintiff,

      v.

ALBERT SCHMIDT, in his official
capacity as Secretary of the
Commonwealth,

      Defendant.

CIVIL ACTION NO. 24-CV-294

(SAPORITO, J.)

## ORDER

AND NOW, this 23rd day of April, in accordance with the accompanying Memorandum, **IT IS HEREBY ORDERED THAT**:

1.    The Secretary's motion for summary judgment (Doc. 37) is **GRANTED** in its entirety;

2.    VRF's motion for summary judgment (Doc. 34) is **DENIED**;

3.    The Secretary's motion to dismiss for lack of jurisdiction (Doc. 65) is deemed **MOOT**; and

4.    The Clerk of Court shall enter judgment in favor of the Secretary on all claims and close this case.

Appx53

Dated: April 23, 2026                    *s/Joseph F. Saporito, Jr.*
                                         JOSEPH F. SAPORITO, JR.
                                         United States District Judge

Appx54

AO 450 (Rev. 11/11)  Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Middle District of Pennsylvania

| | |
|---|---|
| Voter Reference Foundation LLC | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No.  3:24-CV-0294 |
| Albert Schmidt, Secty of Cmwlth. | ) |
| *Defendant* | ) |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐   the plaintiff *(name)* _____ recover from the
defendant *(name)* _____ the amount of
_____ dollars ($ _____ ), which includes prejudgment
interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐   the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____
_____ recover costs from the plaintiff *(name)* _____
_____ .

☑   other:   JUDGMENT is entered in favor of the defendant Secretary of the Commonwealth on all claims

This action was *(check one)*:

☐   tried by a jury with Judge _____ presiding, and the jury has
rendered a verdict.

☐   tried by Judge _____ without a jury and the above decision
was reached.

☑   decided by Judge   Joseph F. Saporito, Jr. _____ on a motion for
    Summary Judgment (Doc. 37 and Doc. 34).

Date: *April 23, 2026*

*CLERK OF COURT*

*Mary Gose Schirra*
*Signature of Clerk or Deputy Clerk*

Appx55

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **VOTER REFERENCE FOUNDATION, LLC,** | ) ) | |
| Plaintiff, | ) | |
| v. | ) | **Case No.: 1:24-CV-00294-JFS** |
| | ) | |
| **ALBERT SCHMIDT**, in his official capacity as Secretary of the Commonwealth of Pennsylvania, | ) ) ) | Judge Joseph F. Saporito, Jr. |
| Defendant. | ) ) | |

### PLAINTIFF'S NOTICE OF APPEAL

Notice is given that Plaintiff Voter Reference Foundation, LLC hereby appeals to the United States Court of Appeals for the Third Circuit from the final judgment entered by this Court in favor of Defendant Albert Schmidt, in his official capacity as Secretary of the Commonwealth of Pennsylvania, on April 23, 2026 (ECF 70) and all decisions subsumed in that judgment, including but not limited to the Court's Memorandum and Order (ECF 68, 69).

Respectfully submitted this 22nd day of May, 2026.

**GRAVES GARRETT GREIM LLC**
*/s/Edward D. Greim*
Edward D. Greim (MO 54034)*
Matthew R. Mueller (MO 70263)*
*Admitted *Pro Hac Vice*
1100 Main Street, Suite 2700
Kansas City, Missouri 64105
Tel.: (816) 256-3181
edgreim@gravesgarrett.com
mmueller@gravesgarrett.com

**BECKLEY & MADDEN, LLC**
Charles O. Beckley, II (PA 47564)
212 North Third Street, Suite 301
Harrisburg, PA 17101
Tel: (717) 233-7691
cbeckley@pa.net

*Attorneys for Plaintiff*
*Voter Reference Foundation, LLC*

1

Appx56

## <u>CERTIFICATE OF SERVICE</u>

I certify that, on May 22, 2026, I filed the above document with the Court's

CM/ECF system. Service will be accomplished on all counsel of record through the

CM/ECF system.

*/s/ Edward D. Greim*
Edward D. Greim

Appx57